Binney.
3b 374
133 365

3b 374
166 543

3 B    374
202    552

*Philadelphia,*
*Saturday,*
March 30.

## Lessee of HALL *against* JACOB VANDEGRIFT and others.

THIS was an ejectment, in which the following case was stated for the court's opinion;

*Sarah Mallowes,* being seised in fee of the premises in the declaration, on the 16th *December* 1723 duly made and published her last will and testament in writing, bearing date the day and year aforesaid, and therein devised as follows: " *Im-* " *primis* I give and bequeath to my kinsman *Solomon Hall* " ten pounds in lawful money, likewise sixty acres of wood- " land joining on the northeast side the plantation he now " dwells on, *I give to him and his lawful begotten* HAIRE *for-* " *ever.*"—" *Item* I give unto my negro boy *Toby,* when he

A devise to *A,* " and his law- " ful begotten " *heir* forever" is an estate tail in *A.*
It is sufficiently clear that in a will, if not in a deed, *heir* is *nomen collectivum,* and the same as heirs.
It is not necessary that the body from which the issue is to come, should be mentioned in express terms, in order to make a good estate tail. It is sufficient if the intention of the testator appears with reasonable certainty.

It is the spirit of the act of limitations to allow twenty-one years from the time that a person might make an entry and support an action, the statute not stopping after it has begun to run, in consequence of infancy coverture or any other disability. But if a party has not a right of entry, but only a possibility which may give a right of entry at a future day, the statute does not run against him, until that right accrues. Hence, notwithstanding the next heir in tail releases to the tenant in tail in possession, the statute does not run against the releasor until the death of the tenant in tail without issue.

" arrives at the age of twenty-four years of age, the sum of
" ten pounds lawful money, likewise ten acres of land lying
" at the north corner of my land, to have *during his life*."—
" *Item* I give and bequeath to my kinsman *Joseph Hall*,
" and to *his lawful heirs forever*, all my plantation that I
" have not before given, with all its improvements thereon,
" I give and bequeath to my kinsman *Joseph Hall* and his
" lawful heirs forever. And for the love and affection I do
" bear unto my kinsman *Joseph Hall*, I do give and bequeath
" unto the aforesaid *Joseph Hall*, all the *reversion* of what
" I have herein before given of my estate both real and per-
" sonal, or of what kind or nature soever they be, I give un-
" to my said kinsman *Joseph Hall and his heirs forever.*"

The testatrix died seised as aforesaid without altering or revoking her said will, *Solomon Hall*, the devisee therein mentioned, surviving her.

*Solomon Hall* the devisee, after the death of *Sarah Mallowes*, entered into the premises, and died seised thereof, leaving lawful issue four children, to wit, *John Hall* his eldest son, *Solomon Hall* his second son, and two daughters, *Sarah*, who intermarried with *David Davis*, and *Mary Hall*.

After the death of *Solomon Hall*, the said *John* entered upon the premises, and about the latter end of 1785, or beginning of 1786, died without issue, his brother *Solomon* above mentioned, who was his heir at law, surviving him.

On the 18th of *May* 1786, the said *Solomon Hall* last mentioned died, leaving lawful issue, *Jacob Hall* his eldest son and heir at law, the lessor of the plaintiff, and five other children.

The defendants are in possession; and they and those under whom they claim, have been in possession of the premises in the said will of *Sarah Mallowes* mentioned, and devised as aforesaid, ever since her death, and claim the same by force and virtue of the following deeds, will, and conveyances.

On the 30th *August* 1750, *William West* and *Elizabeth* his wife, (who who was the widow of *Solomon Hall* the devisee of *Sarah Mallowes*) *Solomon Hall* one of the sons of *Solomon* the devisee, *David Davis* and *Sarah* his wife one of the daughters of the said *Solomon* the devisee, and *Mary Hall*

1811.

Lessee of
HALL
*v.*
VANDEGRIFT

another daughter of the said *Solomon* the devisee, released all their right and title to the property devised by *Sarah Mallowes* as above stated, unto *John Hall* eldest son and heir at law of *Solomon Hall* the devisee of *Sarah Mallowes,* in fee, with a warranty against all claiming under them. [The deed was in these words, " have granted, remised, released, and " confirmed, and do grant, remise, release and confirm to " the said *John Hall,* his heirs and assigns &c."]

On the 26th *April* 1754 *John Hall* and wife conveyed the above premises to *Benjamin Britton* in fee. [And the case then proceeded to deduce the title down to the defendants.]

The question for the opinion of the court, was whether the plaintiff was intitled to recover.

It was argued first in *December* term last by *Condy* for the plaintiff, and by *Rush* and *Hopkinson* for the defendants.

*For the plaintiff.* The plaintiff claims as heir in tail of *Solomon Hall,* under the will of *Sarah Mallowes.* If *Solomon* took an estate tail under that will, we are intitled to recover, otherwise not. The word *heir,* in the singular number, is the only thing which can create a doubt; but we think it perfectly well settled, that *heir* is *nomen collectivum,* and both in wills and deeds equivalent to *heirs;* certainly it is so in a will. The opinion of lord *Coke* is known to be the other way. He says that if land be given to a man and his *heir,* in the singular number, he hath but an estate for life. The reason which he gives for it, is however a bad one; " his heir cannot take " a fee simple by descent, because he is but one, and there- " fore in that case his heir shall take nothing." This reason evidently begs the question; for his heir we say is not one, but all who at different times stand in that relation. Accordingly his learned commentator puts against that opinion many authorities, that as well in a deed as a will, *heir* may operate in the same manner as *heirs,* in the plural. *Co. Litt.* 8. *b. note* 4. Lord *Coke* himself, in a subsequent page, agrees that " heir in the singular number *in a special case* may create " an estate tail, as appeareth by 39 *Ass. p.* 20," where lands were given *to a man and to his wife, and to one heir* of their bodies lawfully begotten, and *to one heir* of the body of that

heir only. This was held to be an estate tail, although to use lord *Coke's* language, it was much more *coarcted* or restrained than the present. *Co. Litt.* 22 *a.* In *Richardson v. Yardley* (*a*) *Popham* says, if land be devised to one for life, and after to his *heir* male, it is tail. The point was expressly decided in *Clerk* v. *Day.* (*b*) All the justices, says the reporter, agreed that a devise to one and the *heir* of his body, is an estate tail; " for heir is *nomen collectivum,* and one can " have but one heir at one time, and this shall go from heir " to heir." To the same point is *Whiting* v. *Wilkins,* (*c*) which was a devise to *Robert Whiting* the testator's son *in pcrpetuum,* and after his decease the remainder to his *heir* male *in perpetuum;* and it was held by the whole court to be a good estate tail in *Robert.* So 1 *Roll. Abr.* 832. *Estate K. pl.* 1., a gift to one and his *heir* was held to be a fee in the donee; and in *Dubber* v. *Trollop* (*d*) Lord *Coke's* opinion is denied to be law by Chief Justice *Eyre* in delivering the opinon of the court.

If it be objected that the body from which the heir must proceed, is not particularly indicated in this case, it is answered that it appears with sufficient certainty. To *Solomon Hall* and his lawful begotten heir, is the same as to him and his heir by him lawfully begotten. It is not necessary to use the words *de corpore.* In *Church* v. *Wyatt* (*e*) the devise was to *A, et hæredibus suis legitime procreatis,* which is precisely the present devise. And in *Barret* v. *Beckford* (*f*) which was a devise to *A* and his legitimate heirs, lord chancellor *Hardwicke* says in terms, the proper construction of *legitimate heirs* is heirs of his body lawfully begotten; for if to him and his heirs lawfully begotten, *that would be heirs of his body.* The difference between a lawful and an illegitimate heir occurs only when the particular parent is referred to. In such a case lawfully begotten heir, means issue.

The testatrix intended to keep this estate in the line of *Solomon Hall.* Though illiterate, she knew the difference between estates. To *Toby* she gives an estate for life, and to *Joseph Hall* a fee simple, in legal terms. When she spoke

1811.

Lessee of
HALL
*v.*
VANDEGRIFT

(*a*) *Moore* 397. case 519.    (*c*) 1 *Bulstr.* 219.      (*e*) *Moore* 637. case 877.
(*b*) *Cro. Eliz.* 313.          (*d*) 8 *Vin.* 233. *pl.* 13.   (*f*) 1 *Ves.* 521.

**1811.**

Lessee of
HALL
*v.*
VANDEGRIFT

of lawfully begotten heirs, she must therefore have intended the lawful issue of *Solomon*. *Joseph* was the peculiar object of her bounty, not *Solomon*. She gave a fee simple to him in a part of her farm, and the *reversion* of what she had before given of her estate, which was the life estate to *Toby*, and the estate tail to *Solomon*. This is very strong to shew that she did not intend the entire fee should go to *Solomon*.

*For the defendants.* This case is not intitled to favour. The spirit of our code is opposed to this restricted inheritance, and has brought the distinction between a fee simple and a fee tail to a mere name, by authorizing the tenant in tail to bar the issue by a deed of bargain and sale. The estate in question has moreover been considered a fee simple since 1723. It has been sold as such to *bona fide* purchasers for a valuable consideration; and the plaintiff claims not only against them, but against the deed of his father. The words in this will, do not in their proper and legal acceptance create a tail; and words must be taken in this way in a will as well as in a deed, unless there is a plain intent to the contrary. If therefore there is nothing like such a plain intent in this will, the consequence must follow, that there is no tail. Whether *Solomon Hall* took for life or in fee is of no consequence; either way the plaintiff cannot recover.

*Blackstone* defines an estate tail in general to be, where lands and tenements are given to one and the heirs of *his* body begotten. Two things therefore are necessary; words of inheritance, and words limiting that inheritance to the heirs of a particular body. 2 *Bl. Comm.* 113. No case has been shewn, where these have been dispensed with in a deed; and it is not conceded that any such case can be shewn. On the contrary there is no doubt, that for want of certainty as to the body, these words in a deed would not amount to an estate tail, but to a fee simple or an estate for life. *Abraham* v. *Twigg* (*a*) is in point that they would not. The deed there was to *A* and his heirs males lawfully engendered; and held that it was not tail. But greater indulgence is shewn to wills, if the intention of the testator plainly requires it. Still it must be a certain and manifest intention, or the legal import of

(*a*) *Cro. Eliz.* 478.

the words must prevail. *Wild's case.* (a) To a man and his seed, or the like, is a good tail in a will. But there the body is designated. Here it is to *Solomon Hall*, and his lawful begotten heir. What is the difference between this and his lawful heir? Does it necessarily mean, begotten by him? Not at all. Any legitimate heir, or in fact any heir, of *Solomon Hall*, is his lawfully begotten heir. There is therefore no evidence of plain intention, because the words will answer for a fee at least as well as for an estate tail. Indeed the intention must be presumed to have been in favour of a fee. Ignorant people uniformly mean to give the whole, where they do not expressly and plainly limit the gift, as the testatrix did in the present will, where she gave *Toby* an estate for life. She probably never heard of an estate tail, and did not know what it was. She takes no particular care of the issue of *Solomon*, but leaves the whole subject to his disposition, at least by some species of conveyance; and what emphatically shews her intention to part with the whole estate, is her closing the devise by the words *for ever.* To suppose that the testatrix knew that these terms would limit the inheritance to any other description of *Solomon's* heirs, than those born in wedlock in some branch or other of his family, and that the estate would upon a certain event cease, is to attribute to her an intimacy with law, which is impossible, and which the will disproves throughout. *Reversion* is of no importance here. The life estate of *Toby*, was enough for that to operate upon.

No case cited for the plaintiff comes up to this. Mr. *Hargrave* in his note 2. to *Co. Litt.* 20 b. cites *Moore, case* 711., for the decision, that a devise to one *et hæredibus legitime procreatis* is tail; but the case of that number is in *prohibition*, and has nothing to do with the subject. In *Church* v. *Wyatt*, there were other parts of the will of much more weight than the particular words in question; the estate being devised over, only in case the first devisee should die without *fruit of her body.* And in *Barret* v. *Beckford*, what lord *Hardwicke* says, must be applied only to the case before him, where there was also a limitation over, if the first devisee

(a) 6 *Rep.* 16 b.

*died without legitimate heirs.* These expressions unequivo-cally confined the issue to the body of the devisee, and there-fore there was a plain intention in the testator that the in-heritance should be restricted. Nothing of that kind exists here. The testatrix was anxious that the heirs should be law-ful, but she did not care who got them.

*Cur. adv. vult.*

The case was again argued at the present term, by *Condy* for the plaintiff, and by *Tilghman* for the defendants, upon the question, whether the defendants were not protected by the statute of limitations.

*For the defendants* it was said that the statute was founded in public convenience, and that its principle was so reasona-ble, that courts of equity had applied it to cases, to which in strictness it did not extend. *Johnson* v. *Smith* (*a*), *Green* v. *Rivett* (*b*), *Eldridge* v. *Knott* (*c*), *Sir Thomas Standish* v. *Radley* (*d*). When it once begins to run, no disability of in-fancy, coverture, or the like, will prevent its running on, un-til the limitation is out. *St. John* v. *Turner* (*e*), *Nevarre* v. *Rutton* (*f*). Hence if the statute began against *Solomon Hall* the younger, it will run against his issue, and the court will favour the application of it to protect such defendants as these.

*Solomon Hall* released to *John* his brother on the 30th of *August* 1750. This release inured solely by way of extin-guishment, as the releasee could not have the thing released. *Litt. sec.* 479, 480. It follows therefore that from the mo-ment of the release there was a possession adverse to the estate tail of *Solomon*, which continued to the bringing of this action in 1804, and is a bar. If the release had passed any estate, I grant that during its continuance, the statute would not have run against the grantor, because the pos-session would have been according to the grant. But it is not so, where nothing passed, but the grant merely ex-tinguished the right of the releasor.

*For the plaintiff.* There are two reasons against the appli-

(a) 2 *Bur.* 961.     (c) *Cowp.* 215.     (e) 1 *Eq. Abr.* 314. *pl.* 4.
(b) 2 *Salk.* 421.     (d) 2 *Atk.* 171.     (f) 2 *Eq. Abr.* 9. *pl.* 6.

cation of the statute, first because it runs, in express terms, only from the time when the right or title to the same first descended or accrued. 2 *St. Laws* 28., *Act of* 26th *March* 1785. Now *Solomon Hall* the younger could have no right or title to this estate until the death of *John Hall* without issue in 1785 or 1786, and twenty-one years did not elapse between that time and the commencement of the action. During *John's* life, *Solomon* had only a possibility to take the estate upon a future event, and therefore it was impossible for the plaintiff during *John's* life to do any thing to obtain possession. Neither he nor his father was intitled to it. The statute was not intended to bar those who could not bring a suit. Besides, *John* and those claiming under him were in possession lawfully during *John's* life, and they could not elect to be in by wrong and adversely to us, under the deed of *Solomon*. A *second* reason is, that if the argument were allowed, it would introduce a new mode of barring intails, never before heard of. The tenant in tail can bar his issue only by fine or recovery, or by lineal warranty with assets.

TILGHMAN C. J. The first question in this case, is, what estate passed to *Solomon Hall*, by the following devise in the will of *Sarah Mallowes*. " I give and bequeath to my kins- " man *Solomon Hall*, 10*l.* in lawful money, likewise 60 acres " of woodland, joining on the northeast side the plantation " he now dwells on, *I give to him, and his lawful begotten* " *heir for ever."* The first reading of these words made a strong impression on my mind, that the land was intended to go to the lawful issue of *Solomon Hall;* and that impression has been strengthened by the argument which we have heard, and by subsequent reflection. I cannot think, that an unlettered person as the testatrix evidently was, would make a distinction between the expression " his lawful begotten " heir," and " the heirs lawfully begotten by him." If the devise had been to him and to the heirs lawfully begotten by him, it would have been a clear estate tail.

I will consider the objections against an estate tail, and the authorities which have been cited. It is objected, that the words *for ever* indicate an intent to give *a fee*. But these words are properly applied to an estate tail, because an estate tail may continue for ever, and was, at common

law, a fee simple of a particular nature. It is next objected, that there can be no estate tail, because the devise is to the lawfully begotten *heir*, not *heirs*. Lord *Coke* in 1 *Inst.* 8 *b.*, does say, that a gift to *A* and his *heir*, is only an estate for life; his opinion is upon a gift by deed, and therefore not strictly applicable to a devise. But even on a deed, the opinion of *Coke* is positively denied by *Eyre* C. J. in delivering the opinion of the court in *Dubber* v. *Trollop*, 8 *Vin.* 233. *pl.* 13. His expressions are, that " the opinion " of *Coke* is not warranted by any thing in *Littleton*, and is " directly contrary to 39 *Ass.* *s.* 20., where lands were " given to a man and his wife and *one heir* of their bodies, " which was held to be an estate tail." In *Whiting* v. *Wilkins*, 1 *Buls.* 219., a devise to *A* for ever, and after his decease to his *heir male* for ever, was adjudged an estate tail. It is there said, that *heir male* and *heirs male* is all one, because *heir* is *nomen collectivum*. The plaintiff's counsel cited other cases to the same purpose, which it is unnecessary to notice, as the point is sufficiently clear. The last and principal objection is, that it is not expressed from whose body the heirs shall issue, but only that they shall be the heirs of *Solomon Hall*, and that they shall be lawfully begotten. The rule of law certainly is, as laid down in 2 *Black. Comm.* 113., that to create an estate tail, it must appear from whose body the issue is to be. The question still recurs, does it not appear by this devise? It is sufficient, if the intention of the testator appears with reasonable certainty. But it is not necessary that the body from which the issue is to come, should be mentioned in express terms. Why was the word *begotten* introduced into this devise, if not intended to designate heirs begotten by the devisee? It is too far fetched an idea, to suppose, that the testatrix looked to the *general* heir, and used the words *lawfully begotten* only to prevent any person *unlawfully* begotten, from inheriting. The defendant's counsel think it unnatural that an ignorant woman should take it into her head to create an estate tail. I agree with them, that she might not think of an *estate tail*, because probably she did not know what it was. But it was very natural that she should wish to limit the estate to the issue of the devisee. The desire of confining property to a particular family, seems

deep rooted in the human breast. From whence this passion springs, which delights in exercising a kind of dominion over property after death, it is unnecessary to inquire. But the fact is, that we see it prevail in people of *all conditions.*

I have hitherto considered the intention of the testatrix, as appearing only from the words which I have mentioned. But there are other parts of the will which strengthen the idea of an estate tail. In the concluding paragraph the testatrix devises land to her kinsman *Joseph Hall* and to his *lawful heirs for ever.* Also for the love and affection she bears him, she gives to him and *his heirs for ever*, all the *reversion* of what she had before given of her estate both real and personal. Here it appears, that *Joseph* was her favourite, and that she knew how to give an absolute fee simple, where she intended it. The devise of the *reversion* may it is true be satisfied, by referring it to a piece of land which had been given in the former part of the will, to the negro boy *Toby* expressly for *life.* But it may also be referred to the land devised to *Solomon Hall*, and at all events it leaves no ground for the argument which might otherwise have been raised, that a fee simple was intended to *Solomon*, because there was no devise of the reversion.

These are the arguments which would have satisfied me, that *Solomon* took an estate tail, if no authorities could be produced on the subject. But we are not without respectable authority. Mr. *Hargrave* in his edition of *Co. Litt. note* 121., says, a devise " to one and his heirs lawfully " begotten," is an estate tail; and he cites 43 *Eliz. rot.* 1408., *Moore, case* 711. It is very true that nothing is to be found in *Moore* to support this opinion. There is certainly a mistake in the reference to *Moore.* Whether the original roll justifies Mr. *Hargrave's* citation, we are left to conjecture. In general he bears the character of a man of accuracy. But what has much greater weight with me is the opinion of lord *Hardwicke* in *Barret* v. *Beckford*, 1 *Ves.* 521., that a devise to one and *his heirs lawfully begotten*, means *heirs of his body.* The case decided by lord *Hardwicke* did not turn on those words, but the opinion I have mentioned was given in the course of his argument. It is not of equal authority with an adjudged case, but considering the man from whom it

came, it carries weight with it. Upon the whole I am well satisfied that *Solomon Hall* took an estate tail.

The second question is on the act of limitations, and will depend on the effect of the deed of the 30th *August* 1750, from *Solomon Hall* deceased (father of the lessor of the plaintiff) to *John Hall* son and heir of *Solomon* the devisee. At the time of making this deed, *John Hall* was seised of the premises as tenant in tail, and *Solomon* (the grantor or lessor) was not seised of any estate, but had a possibility of becoming tenant in tail, in case of *John's* death without issue. The deed contains words of *grant*, as well as of *release*, and there was a small consideration of money. It is contended for the defendant, that this deed operated by way of *extinguishment* only, and that the act of limitations began to run from its date. If the grantor had any right capable of being transferred, the deed would operate as a *legal transfer* during his life. It would pass an estate in fee simple, defeasible by the entry of his issue. It did not take away the right of entry of his issue, because it could not work a discontinuance of the estate tail. I cannot conceive that the act of limitations could take any effect, before the death of *John Hall* the grantee, because during his life he was rightfully seised of an estate tail. Immediately on his death, a right to the estate tail descended upon *Solomon* (the father of the lessor of the plaintiff), or would have descended on him, if he had not made the deed before mentioned. From that time there was a possession *adverse to the estate tail*, and from that time the act of limitations would run. This act made in the year 1785, enacts, that no person shall make an entry into any lands &c., after the expiration of twenty-one years next after his title *first descended or accrued*, nor shall any person maintain any action for any lands &c., of the seisin or possession of himself or his ancestors, or declare or allege any other seisin or possession of himself or his ancestors, than within twenty-one years next before the commencement of his suit. Now the right of the lessor of the plaintiff's father *Solomon Hall*, first descended or accrued on the death of *John Hall* his brother within twenty-one years before the commencement of the suit. At the time of his making the deed, he had neither right or title *accrued*, but only a possibility that it might

thereafter accrue. It is the spirit of the act of limitations to allow twenty-one years from the time that a person might make an entry, or support an action; understanding always that when the twenty-one years once begin to run, they shall not be suspended by infancy, coverture, or any other circumstance. Upon this principle, the lessor of the plaintiff is not barred of his action. I am therefore of opinion, that he is intitled to a judgment.

YEATES J. It is admitted on all hands, that the words " *heirs of the body*" are the proper technical terms, to create an estate tail in all grants and gifts by deed; but it is also certain, that the precise expressions *de corpore* are not indispensably necessary in such cases to create an estate tail, so long as there are other words equivalent; as in a grant to " a man " and his wife, and the heirs by them procreated," or " to a " man and his heirs which he should beget on the body of " his wife," &c. *Co. Litt.* 20 *b.*, 7 *Co.* 41 *b.*

In wills the fundamental principle is, that the intention of the testator shall govern the construction; provided the estate devised be not inconsistent with the rules of law. It is a melancholy truth, that men too frequently postpone putting their houses in order, and making their final arrangements until the last moments of their existence. Hence the legal presumption arises, that in the performance of this solemn act, they are ignorant of the law and without learned counsel; for which reason, the law will execute their intention, if it can be plainly collected from the expressions they have made use of.

By recurring to the instrument before us, we find, that *Sarah Mallowes* the testatrix, bequeathed " to her kinsman " *Solomon Hall* 10*l.*; likewise 60 acres of woodland adjoining " on the northeast side the plantation he then dwelled on, " she gave *to him and his lawful begotten haire for ever.*" To her negro boy *Toby*, she gave 10 acres of land lying on the northeast corner of her land, to have *during his life:* " and " to her kinsman *Joseph Hall* and *to his lawful heirs for ever,* " she gave all her plantation, that she had not before given, " with all the improvements thereon to him *and his heirs for* " *ever;* and for the love and affection she had unto him, she

VOL. III.                           3 C

" gave and bequeathed to the aforesaid *Joseph Hall*, all the
" reversion of what she had therein before given of her es-
" tate both real and personal, or of what kind or nature
" soever unto her said kinsman *Joseph Hall and his heirs for*
" *ever*."

It appears then, that *Joseph Hall* was the favourite object
of her regard and affection; and that whoever penned the
will, knew well how to describe an estate for life, as well as
an estate in fee simple. It would naturally occur to any one
who reads this will, to inquire why in the devise to *Joseph
Hall* the words used are *to him and his heirs for ever*, and
in the devise to *Solomon to him and his lawfully begotten heir
for ever*, if the testatrix meant to grant to each devisee a fee
simple? The difference of phraseology would seem to im-
port a difference of intention; and this construction is forti-
fied in my idea, by the expressions " *his* lawfully begotten
" *heir*." The pronoun *his* coupled with the other words, has
the same signification as *by him* lawfully begotten, negativing
the idea of *collateral* heirs; and *heir* in the singular number,
would seem to point to the individual heir at common law,
claiming *per formam doni*, in contradistinction to the rules of
descent established by our acts of assembly. At the same
time, I freely admit, that *heir* may be *nomen collectivum* as
well in deeds as wills, and operate in both in the same man-
ner as *heirs* in the plural number, according to the authori-
ties cited in *Hargrave's note* 4 to *Co. Litt.* 8 *b*. The ex-
pressions *for ever* are often inserted in the formation of estates
tail. The issue in tail may by possibility exist the same
period of time as general heirs.

The case of *Abraham* v. *Twigg* was cited by the defen-
dant's counsel from *Cro. El.* 478. It is said in the conclusion
thereof, that in a devise, the words *of the body* must be ex-
pressed to make an estate tail. But this is contradicted by
the whole current of authorities; and in a more full report
of the same case in *Moore* 424., the instances of feoffments
and wills are expressly distinguished from each other in this
particular. The rule at law is, that in every estate tail,
within the statute of *Westm.* 2., it must be limited either by
express words, or words equipollent, of what body the heir
inheritable shall issue. *Co. Litt.* 27 *b*. And if it be not ex-

1811.

Lessee of
HALL
v.
VANDEGRIFT

pressed, it cannot be taken to be within the equity of the said statute; so that if the gift be to one and his heirs females or males, the donee has a fee simple. *Litt. s.* 31. The only question here therefore is, whether the testatrix has used sufficient words to limit the inheritance of the 60 acres of land in dispute to the issue of *Solomon Hall.* To the different abridgments for the several decisions on this subject, I refer. 10 *Vin.* 254, *T. 5. Tail.*—3 *Com. Dig. Devise N. 5.* 26. 1*st ed.*—2 *Bac. Estate Tail B* 259. 1*st ed.* The expressions of lord *Hardwicke* in *Barret* v. *Beckford*, 1 *Ves.* 521., are very strong. The proper construction of *legitimate heirs*, is heirs of his body lawfully begotten; for *if to him and his heirs lawfully begotten*, that would be heirs of his body.

But the case which most nearly resembles the present, is that of *Church* v. *Wyatt, Moore* 637. case 877., *Hil.* 37 *Eliz. C. B. Rot.* 1408., (which in *Hargr. note* 2. to *Co. Litt.* 20 *b.* is called 43 *Eliz.*, but in the same *court, term,* and *roll*). There one seised of a copyhold inheritance, surrendered it to the use of his will; and having a daughter born, and a child in *ventre sa mère*, devised part of the land to his son or daughter in *ventre sa mère*, wherewith his wife was then going, and *hæredibus suis legitime procreatis*, and the residue he devised to his daughter born, to have to her and the fruit of her body, and if she should die without fruit of her body, remainder to the child in *ventre sa mère*, and if both should die *without fruit* &c., then that *J. S.* should sell the lands; and he willed, that *one should be heir to the other.* And all the justices agreed that it was an estate tail in the daughter after born. It is true, that case was stronger than the one now before the court, by reason of the words *without fruit of their bodies*, and *that one should be heir to the other.* But we have the authority of lord chief baron *Comyns* in the third volume of his *Digest N. 5. Devise p.* 26, 1*st ed.*, that the words "*hæredibus suis legitime procreatis*," in a will, create an estate tail without other words; and Mr. *Hargrave* in his note before referred to, adopts the same opinion. The different operation of the same words in deeds and wills is strongly marked in *Idle* v. *Coke*, 2 *L. Ray.* 1144., 1 *Wms.* 70., *Salk.* 620., 11 *Mod.* 57., *Holt.* 164.; and conceiving here that the intent of the testator was plain and manifest, that

the inheritance of the 60 acres in question was limited to the lawful issue of *Solomon Hall*, I am of opinion that he took an estate tail in the premises.

A second point has been made and argued during the present term. It has been objected that the plaintiff is barred from recovery of the premises by the act of limitations, the release of the 13th *August* 1750 operating by way of extinguishment; that no interest whatever passed thereby, and the statute then attaching, it ran on notwithstanding subsequent infancy, coverture &c. But the release of *Solomon* (the second) did pass his future contingent interest in case he should survive his elder brother *John*, and that the same *John* should die without issue. Were this even otherwise, the plaintiff would not be barred. Previous to the act of 26th *March* 1785, the statute of 32 *Hen.* 8. *c.* 9., and not the statute of 21 *Jac.* 1. *c.* 16., was held to be in force here. 1 *Dall.* 67. Now counting back from even *December* term 1804 (when this ejectment was commenced) to *August* 1754, only fifty-four years and four months would have elapsed, which is five years and eight months short of the period of time declared by the statute of 32 *Hen.* 8. *c.* 9. to operate as a bar.

If the devise to *Solomon Hall* was an estate in fee tail, his eldest son *John Hall* and those holding under him, were intitled to the legal possession of the premises during the natural life of the said *John Hall*, and therefore they could not be considered as holding by an adverse title to the lessor of the plaintiff. The act of assembly of the 26th *March* 1785, 2 *St. Laws* 281., was passed previous to the death of *John Hall*, as it is agreed that he died in the latter end of 1785 or beginning of 1786, and consequently the estate tail then descended on and accrued to him. Before this time he could make no legal entry, nor support an ejectment. The provisions therefore of the law of 1785 only can preclude him from recovering the lands in question. But his case is not embraced by the act, the second section enacting, " that from " *henceforth*, no person shall make entry into any manors, " lands &c., after the expiration of twenty-one years, next af- " ter his right or title to the same *first descended or accrued.*" There is an interval of nineteen years between 1785 and

1804, and therefore the act interposes no bar in the present case.

· Whatever my private feelings may be in favour of innocent purchasers, I feel myself bound to give my voice that judgment be entered for the plaintiff.

BRACKENRIDGE J. To make this an estate tail there are wanting the words *of the body;* and it is only on the ground of an intention to intail, that the words used can be construed an intail; and this on the ground of indulgence in a devise. But I do not believe that an estate of this nature was intended; and this from considering,

1. The rank and country of the devisor. Had she been of the gentry or nobility of *England*, I could more readily have inferred the family pride of preserving an estate unbroken, and continued in the succession of a single heir. But the will in question was made in this state, and by an inhabitant of it.

2. The nature of the estate devised. It is not such a possession as one would suppose she could have had a wish to preserve undivided: a piece of woodland conterminal to the estate of the devisee; a strip of 60 acres, which if not given out and out, as we say in common parlance, would not so well suit the estate which he had adjoining.

3. I cannot easily suppose that if she had considered it an estate tail, there would not have been some understanding of it in the immediate devisee, and his family, and some tradition respecting it; whereas it appears not to have been thought of on the son of the devisee taking. Else why releases from the other children, if as heir in tail he could alone take? Or why not bar before alienation? It is evident that it did not come into his mind, or of those concerned at that day, that it was not a fee simple.

The reversion she bequeathes to *Joseph Hall*, is satisfied by referring to the life estate in the devise immediately preceding to the boy *Toby;* so that it will not be necessary to construe this an estate tail in order to constitute a reversion.

But from *the terms* of the devise, must not an intention be inferred of devising in tail? No. The language of the will is evidently that of a half learned person, with *motes of law*

Lessee of
HALL
*v.*
VANDEGRIFT

*terms glimmering in his brain;* but without seeming to know the use of each, in its particular place. *Lawful heir, begotten heir,* used now, and omitted again, carries with it evidence to me, of one who was aiming at the diction of the learned; or having an idea that certain terms of art were necessary in a will, without knowing where to place them.

But are not the terms such as are peculiarly applicable to an estate tail? The word heir in the singular number, (for I will read it *heir,* though it is spelt *haire*) and the word *begotten.* Agreed. But there is the word "*forever,*" that is destructive of their special meaning, and goes to the fee simple. It is the natural adjunct of a fee simple, and inconsistent with an estate tail; which, in the nature of it, is not supposed to last *for ever,* but to be revertible to him from whom it came. An estate tail clearly given, yet *would be raised to an estate in fee simple* by the word *forever,* as implied in the observations of lord *Mansfield, Cowper* 412. The law contemplates as certain the determination of every estate tail. *Fearne* 171. And " a life estate to *M* (wife), remainder to *M* " (daughter) and the heirs of her body lawfully begotten, or " to be begotten, *as tenants in common*" gives a fee simple by purchase. So I say of the word *forever.* It is a word technically belonging to the fee simple; and being the more worthy, in the language of grammarians, must qualify and raise the special meaning of the others to its own dignity.

I must confidently demand that this at least be granted me, that the word *forever* qualifies, so far as to leave in balance the evidence of intention drawn from the mere force of the terms. The question then will be, to which construction shall I incline, where the evidence of intention is in balance. I speak of the evidence which is attempted to be drawn from the use of the terms. Which estate shall be favoured; that of the intail, or the fee simple? If we advert to juridical history, we shall find that the fettering of alienation by the fee conditional at the common law, was not a favourite of the judges, but that they winked at the evasion of it; or in the words of *Blackstone,* " gave way to a subtle finesse of construction, in " order to shorten the duration of these estates." And he goes on to observe that " when the nobility by procuring the statute " *de donis,* introduced the fee tail, the courts, by a kind of *pia*

" *fraus*, eluded the statute, by a fiction in barring the intail." And though the maxim of serving the intention in a devise, was extended in the construction of an estate tail, as well as with regard to any other subject of a devise, yet it is impossible not to see, in the juridical history of *British* decisions, what I may call an emancipation from the shackles of early precedent, in the case of intails; and I cannot but be of opinion, that were the same judges who at an early period made some of those decisions, on a bench at this day, they would be shackled still less; in this country, more especially, where a change of property under such decisions, could not affect; and where, in inferring an intention, they would look to the manners, customs, and habits of the people. 2 *Massachusetts Reports*, 62.

Nor is it only to these that we are to look, but to the *laws* of a community, and the policy of a construction according to the spirit of the statutes on the same subject. Under our colonial government, the policy of the intail became more questionable than it was in the mother country. The right of primogeniture did not exist in the same extent; nor was there the same reason for it, the support of a nobility. If we look to the early laws of distribution in the case of intestacy, we shall discover the inclination to subdivide estates amongst the individuals of a family, which is totally repugnant to the succession of a single heir. Is it not justifiable in narrowing or enlarging rules of construction, to look at the progress of alterations in the law itself by the legislature of a country? Is it not justifiable to look at even the change in the state of society which may vary the reason of a rule? We brought no church establishment with us from *England*, to enable us to provide for younger branches; nor was there an equal opportunity of advancement in the army or navy. The locking up estates was unfavourable to the " enlarging the em- " pire, and promoting useful commodities," which is recited in the charter as a consideration of granting it, and to which the subdivision of property was favourable. Shall we not take these things into view in the indulgence we shall give to the construction of terms not technically constituting an estate tail? In the application of a rule of construction, or even

in the application of a principle under a different state of things, there is this latitude. *Talis enim est humani juris disciplina, ut opiniones, secundum varietatem temporum, senescant et intermoriantur, aliæque diversæ renascantur, et deinde pubescant.* A rule of construction is spoken of as flexible. See *Blackstone's* argument, *Perrin* v. *Blake.* Why not yield to a change in the genius and spirit of a system?

But taking it even according to the precedents to which we are referred of *British* decisions at the earliest period in the construction of terms, there has been none read that comes up to this. Nay, devises, as it would seem to me, more looking like an estate tail, have been adjudged a fee simple. I refer to the case of *Abraham* v. *Twigg*, " heir male lawfully " engendered," held not an estate tail, because there was not any *body* from whom this heir male should come. This case was that of a deed; but it is added in the report, *Cro. Eliz.* 478., that " so *it is in the case of a devise.*"

In the devise in question there is not only the want of the word *body*, which must be supplied to make an estate tail, but the word *ever*, which must be rejected to keep clear of the fee simple. I incline more to reject the word " begotten," and the insensible word " *haire;*" and the devise will then be " to him and his for ever," which in a devise is a fee simple.

The word *haire* is insensible, and I must reject one letter, and transpose another, to make it *heir.* Why this spelling to make out an estate of questionable policy, and of extreme hardship in an individual case? There can be nothing collected of improvidence in the ancestor, or that in transferring to the defendants, or those under whom they hold, there was not a full and valuable consideration which has substantially come to the use of the family, and of which the plaintiff himself may be presumed to have participated; and the amelioration of the property which may be presumed to have been made by the labour and the money of the defendants, must aggravate the hardship of a recovery against them; more especially as they are without warranty from the ancestor, and even if they were not, the value of the estate more than half a century ago, would go but little way to alleviate the misfortune. It cannot therefore be supposed that under these circumstances I can have any great inclination to col-

lect and infer from technical terms merely, an intention which does not appear by declaration plain, or necessary and unavoidable inference. But the fact is that I could not possibly infer, were I disposed to indulge a construction, that she meant a *taking in succession by the eldest born*. The *tout ensemble* of the whole will together carries with it to me intrinsic evidence of the contrary. I take it to have been drawn by some *clerk's vade mecum* scrivener of the neighborhood, who had seen words in forms, and took them to be necessary in a last will and testament, without distinction of the use. This from my knowledge of the country, and what is usual in such cases. And I take it from the length of time that had elapsed before the idea of an estate tail in this case would seem to have been entertained, that the discovery of it at last was a matter of accident; and that it may well be called a windfall to the plaintiff succeeding in it. The terms of this devise therefore, on the strictest precedents, not imperiously demanding of me the construction contended for, I shall not give it; but hold the estate devised in this case a fee simple. It becomes therefore unnecessary for me to go into a consideration of the other point that has been made in the argument, the statute of limitations.

1811.

Lessee of<br>HALL<br>v.<br>VANDEGRIFT

Judgment for plaintiff.