Weldon, J.,
delivered the opinion of the court:
The State of Louisiana in September, 1886, filed a petition in this court, alleging against the United States two causes of action, the first founded on the statute of February 20, 1811, entitled “An act to enable the people of the Territory of Orleans to form a constitution and State government” (2 Stat. L., •641), the last section of which reads as follows:
“And be it further enacted, That 5 per cent, of the net proceeds of the sales of the lands of the United States after the '1st day of January shall be applied to laying out and constructing public roads and levees in the said State as the legislature thereof may designate.”
The second cause of action as alleged is founded on the act of September 28, 1850, entitled “ An aet to enable the State of Arkansas and other States to reclaim the swamp land within their limits (9 Stat. L., 519); and the further statute of March 2, 1855, entitled “An act for the relief of purchasers and locators of swamp ■amd overflowed land.” (10 Stat. L., 604.)
Under the first act it is alleged the defendants owe the petitioner the sum of $47,530.79, and .under the latter the sum of $23,855.04, aggregating the sum of $71,385.83.
To these claims the United States interpose, first, the statute ■of limitations as to the demand under the act of March 3,1855, and, second, a counter-claim as to the alleged right under both statutes.
The statute of limitations within which suits must be brought, of the character disclosed by the petition, prescribes a limitation of six years; and if prior to September 20,1880, the claim *288 ant’s cause of action was complete and consummate, then the objection is well taken, and as to the demand under the act of 1855, the petition must be dismissed. (Rev. Stat., § 1069.)
The statute of 1855 was passed to remunerate the States for land located by grants from the United States upon lands which, from their character as swamp and overflowed land, had become the property or right of the State under provisions of the act of September 28, 1850, commonly known as the “ Swamp Land Act;” and, to effectuate that policy, it is provided in the second section of said act of 1855:
“ That upon due proof, by the authorized agent of the State or States before the Commissioner of the General Land Office, that any of the land within the true intent and meaning of the act aforesaid had been sold by' the General Land Office, the purchase money shall be paid over to the said State or States.”
The question arises under the various acts, at what time did the claimant have a right to bring suit in this court under the law of our general jurisdiction? If the two acts, the one of September 20, 1850, and the one of March, 1855, made consummate its right, then long before the petition was filed the limitation had ceased, and the petitioner is now without remedy in the judicial department of the Government. If the right to sue was under said acts merely inchoate, and did not mature until the happening of a subsequent event, then the right to sue became perfect upon the happening of that event; and the limitation of six years commences from the date of the event. If, in the absence of any action upon the part of the Commissioner of the General Land Office, the claimant had brought suit, would not a plea embracing the facts contemplated by the second section of the act of 1855 be a good plea in bar ? If so, then the right of action was not complete under the acts of 1850 and 1855, unaided by the agency of the Commissioner of the General Land Office under the second section of the act of 1855.
When the right of action depends upon a contingency, the statute does not begin to run until the contingency happens. (Jones v. Lightfoot, 10 Ala., 17.) It is a general rule that the statute of limitations begins to run from the time when the right of action accrued. (Odlin v. Greenleaf, 3 N., 270; Hall v. Vandegrift, 3 Binn., 374; Withers v. Richardson, 5 T. B. Monr., 94.)
*289 The cause of action legally stated b'y the petition, and sustained by the facts, in its unity, is composed of the rights of the claimant, originated by the act of 1850, recognized and enlarged by the act of 1850, and consummated by the agency of the Commissioner of the General Land Office under the second section of the last-named act.
But aside from the provisions and phraseology of the second section of the act of 1855, what are the rights of the claimant in relation to its cause of action for the recovery of the proceeds of the sale of lands sold in violation of the claimants right under the act of September 28, 1850 % The grant made in the act of 1850 was never revoked, but was recognized by the act of 1855 5 and the sales of lands by the United States after the passage of the law of 1850 was a sale by the grantor of the property of the grantee — a sale of the holder of the legal title in violation of the rights of the equitable owner$ so that the proceeds of the lands became, in the hands of the Government, a trust fund, and as such would be unaffected by the statute of limitations until there was a disavowal of the trust by the refusal of the trustee to recognize the rights of the ces-tui que trust.
The law of 1855 did not assume to revoke or invalidate any of the guarantees under the law of 1850, but simply to provide that the proceeds of the sale of swamp land should stand as the equitable representative of the land sold by the Government, in violation of the purposes of the act of 1850. It is not necessary to invoke the doctrine of trust to sustain the jurisdiction of the court, and we only refer to it as tending to strengthen the reason in favor of our jurisdiction. As will be seen by the findings, the act of the Land Commissioner, which under the law made the cause of action complete, did not occur beyond six years from the bringing of the suit; so that the cause of action accrued to the claimant within the limitation prescribed by section 1069. The statute of limitations as to the claim under the act of 1855 being disposed of, the claim, in its entirety, is submitted to the consideration of the court upon its merits as a legal demand against the Government. The affirmative right of the claimant to recover under both laws the sum of $71,385.S3 is not seriously disputed, and the controversy arises as to the payment of it by the application of the set-off or counter-claim.
*290 Having examined the claim of the petitioner as to the objections urged by the defendants, we now consider the set off filed as a counter-claim against the petitioner. The Government officers insist that there is due the United States, under the Act August 5, 1861 (12 Stat. L., 292), commonly known as the “ Direct Tax Act,” a sufficient amount to discharge the liability of theUnited States to the claimant,because of the delinquency of the defendants in the payment of the proceeds under the various statutes herein stated. As against the set-off, it is urged that the fund represented by the amount due to the claimant is in the hands of the State of Louisiana, a trust fund to be used for a specific and definite purpose; and that whatever may be the legal liability of the State for the unpaid amount' of the direct tax, it is not a proper matter of set-off in this proceeding ; that the tax is not a legal liability on the part of the State, but a delinquency on the part of the citizens of the State of Louisiana; that Congress never intended that it should be a tax against the State unless voluntarily assumed by the State, and that under the Constitution it is not within the constitutional power of Congress to assess a tax against a State in its political and municipal capacity. We will consider some of the points made in the inverse order stated:
The power of Congress to pass a direct-tax act, and so apportion the tax as that in law it becomes an assessment against the State as a political department of the Government, involves a discussion as to the constitutional structure and mold of the Government, and might be very pertinent in this connection were it not for our conclusions as to the statute originating and recognizing the subject-matter of the counter-claim. Whatever may be said of the power of Congress in the abstract, it is sufficient in this case to hold that by the policy and purpose of the act of 1861 Congress intended to distribute to the State of Louisiana the sum of $385,886.67 as its share of the $20,000,000 levied by the act of 1861 to be collected from the citizens of the United States living in that portion of the United States known as the State of Louisiana. The assessment was made against and upon the property of citizens of the United States, and dealt with individuals, except as to the mere mode of distribution.
It was an application of that theory of constitutional law, which holds that the powers of the General Government operate with reference to the scheme of Federal authority, upon the *291 individual citizen inhabiting the territory of the United States, as plainly indicated by the means it provided for the assessment and collection of the tax.
The fifty-third section of the act of 1861 provides for a condition upon which the claim of the Government is predicated in this case, clearly indicating that in the absence of such condition there would be no liability upon the part of the State. It is not pretended that the State of Louisiana, by any act of its legislature, or other authoritative power, either during or since the war, assumed the payment of its share of the $20,000,000 assessed under the act of 1861. The citizen failed to pay and the State failed to assume; so that in 1862, Congress had to pass the act of June 7,1862, providing a more efficient mode for the collection of tax in the insurrectionary States, of which Louisiana was one. The fact that section 53 provides for a set-óff between a State or Territory and the United States will not avail the defendants in their theory of construction, unless it is shown that the State had assumed the tax, because upon that assumption is based the right and power of deduction.
Although this is a controversy between States, the one general and the other local, the same rules of law apply, upon the subject and doctrine of set-off, that prevail in judicial controversies between citizens litigating'the most ordinary interests of life. The legal character of set-off is very aptly defined by the report of the Senate Judiciary Committee, in which it is said set-off “ means the application of a valid demand against the creditor in satisfaction or determination of his claim.” The claim in order to be a good set-off, must be between the same parties upon debts mutually due in the same character. This is the settled construction of the English statute which introduced into the law of England the doctrine of set-off, and it has been followed by American courts in all jurisdictions where the matter has been the subjectof judicial determination. (1 Chitty on Contracts, 1266.) .
Citizens owe allegiance and receive protection, and coincident with that obligation and right, they owe taxes when properly assessed on their property. States perform the functions of administration, and do not contribute to sustain theNational Government in the payment of taxes, unless they voluntarily assume the performance of that duty, by the consent and request of the national authority.
A case similar in legal substance to the one at bar arose *292 with the State of Georgia in the execution of the act of 3d of March, 1879. In the sundry civil service bill of that year it was enacted that the State of Georgia should be reimbursed for expenses incurred in the suppression of the hostilities of the Creek, Seminole, and Cherokee Indians, in the years 1835,1836, 1837, and 1838.
At the time the State authorities sought to receive from the Government the indemnity provided by said act, there was on the books of the Treasury Department an unpaid balance under the Direct Tax Law of 1861, and the question was raised whether that unpaid balance could in law be set off against the amount to which the State of Georgia was entitled under the act of 1879. Upon the question of the liability of the State for an unpaid balance, under the act of 1861, in the absence of any assumption on the part of the State, we quote from the very able opinion of Mr. A. G. Porter, First Comptroller of the Treasury. Upon the fact that the State of Georgia never assumed the payment of the direct tax, he said:
“ If the sum apportioned is a debt owing by the State of Georgia as apolitical corporation, then it may be assumed that it ought to be so credited. If, however, it is a debt owing by the persons within that State, whose lands have been taxed, and not by the State itself, then the payment ought not to be withheld. * * * The privilege of the State to assume implies that the debt before the assumption was not its own. Before the adoption of the Constitution the person whose property was charged with the tax owed the tax to the State because the State imposed it, and levied and collected it. Since the adoption of that instrument the United States has imposed the tax, and has itself levied and collected it. The obligation of the citizen is therefore to the Union and not to the State, and he, and not the State, is the debtor.”
It is not necessary to cite further authorities to establish the character of the claim sought to be set off against the demand of the claimant, its origin under a statute having the provisions of the act of 1861; the legislation of Congress, providing means and directing the mode of collecting the tax, the right given to the States to assume the share allotted to each State, the act of 1862 providing for the collection of direct taxes in insurrec-tionary districts, are sufficient to indicate the legal character of the debt alleged in the set-off. The conclusion resulting from such reasoning is that the claimant recovers the sum of $71,385.83, and that the counter-claim be dismissed. Judgment will be entered for $71,385.83.