1814.

DRUM
*v.*
Lessee of
SIMPSON.

</div>

---

Lessee of ANTHONY SNYDER and others *against* SIMON SNYDER.

IN ERROR.

THIS was an ejectment in the Common Pleas of *Northumberland* county, for 171 acres of land, which the lessors of the plaintiff claimed as the children of *John Snyder* deceased.

Upon the trial below, the plaintiff proved title in *John Snyder* at the time of his decease, and there rested his case.

On behalf of the defendant, who was merely the tenant in possession, and claimed no title personally, the real dispute being between the lessors of the plaintiff, and the children of *Anthony Selin*, to all of whom he stood in the relation of uncle, the following case was then exhibited:

Upon the 19th *May* 1787, letters of administration to the estate of *John Snyder* issued to his brother the defendant, to his widow *Mary Snyder*, and to her brother-in-law *John Miller*. An original inventory amounting to 130*l*. 5*s*. 10*d*. was shewn from the office, endorsed in the handwriting of the register at that time, "taken and appraised 19th *May* "1787, by *Albright Swineford* and *George Weyrick*, duly "qualified for that purpose." On the 1st *January* 1788, a petition in the handwriting of the defendant was preferred to the Orphans' Court, to which he subscribed his own name and those of the other administrators, setting forth the insufficiency of *John Snyder's* personal estate to pay the debts, and maintain the children; that the debts, then come to the knowledge of the petitioners, were 642*l*., and the appeal, but may be questioned in an ejectme

<div style="font-size: smaller">

*Sunbury,*
*Saturday,*
June 18.

A husband cannot be a witness, where, in consequence of his testimony, his wife may receive a benefit after his death.

Parol evidence is inadmissible to shew that half an acre of land included in a deed by administrators, was excepted out of the estate at the time of sale.

So it is inadmissible to shew that a sheriff had under execution the body and lands of a third person. The execution should be shewn by the records.

A question cannot be put to a witness so framed as to indicate the answer which the party wishes, *e. g.* " did he assign to " you as a reason " why he would " not bid more " for the isle of *Q*, " that he could " buy *W's* land " for, &c."

A sale by order of Orphans' Court is not conclusive until reversed on

</div>

credits (including 220*l.* the amount of the goods sold at vendue) 430*l.*, leaving a deficiency of 212*l.*, and praying an order of the Orphans' Court to sell the real estate. On the succeeding day, the defendant was sworn to the truth of the statement by him exhibited with the petition, and an order was granted to sell the real estate on a certain day.

No sale having taken place on this order, a second order was obtained at the instance of the defendant, on the 1st *April* 1788, to sell on the 27th *May* following. The premises however were not sold under this second order, and it was again renewed on the 5th *October* 1790, upon the application of *all the administrators*, and a public sale was directed to be held at the court-house in *Sunbury*, on the 12th *November* following.

Upon the 3d *January* 1791, a return of sale was made by the administrators, but not signed by them, stating that agreeably to the order of the court, they had sold the said real estate to *Anthony Selin* for 666*l.* 12*s.*, he being the best and highest bidder; and the Orphan's Court thereupon confirmed the sale, and directed that it should remain firm and stable for ever.

The administrators afterwards by their deed dated 12th *June* 1791, wherein the different proceedings in the Orphans' Court were recited, conveyed the premises to *Selin;* and the deed was duly acknowledged by the defendant on the 2d *December* 1803, by *Mary Snyder* (who had married *Jacob Kendig*) on the same day; by *John Miller* on the 27th *February* 1804, and by *Jacob Kendig* on the 23d *August* 1805.

The title being thus shewn out of the lessors of the plaintiff, by the sale and conveyance to *Selin*, they endeavoured to defeat this title by several objections, which may be ranked under three heads. 1. To the proceedings in the Orphans' Court, as being on the face of them irregular, and contrary to law. 2. To the proceedings at the time of sale, on the part of *Anthony Selin*. 3. To the conduct of the defendant in unnecessarily inducing the sale, and becoming himself a secret purchaser with *Selin*.

Under the *first* head, the objections were 1. That the original petition was signed by one only of the administra-

1814.

Lessee of
SNYDER
et al.
v.
SNYDER.

tors. 2. That there was no proper inventory filed, or administration account settled, to authorize the order of sale: the time of filing the former not appearing, and there being but a mere statement in place of account. 3. That the defendant alone was sworn to the truth of the statement accompanying the petition for a sale. 4. That the return of sale was not *signed* by the administrators.

Under the *second* head, they produced evidence that *Anthony Selin* had behaved with much violence at the sale, and had threatened to knock down any person who should bid against him; in consequence of which, a competitor of the name of *Bower* was deterred, as he said, from offering within 400*l.* or 500*l.* as much as he otherwise would have done for the property. They at the same time gave evidence that *Selin*, before and after the sale, said he would buy and had bought for *John Snyder's* children.

Under the the *third* head, they gave evidence that *A. Selin* and the defendant were partners at the time of the sale, that the defendant came into possession after *Selin's* death, and had spoken of the property as his. They also shewed that *John Snyder* had purchased this land at sheriff's sale for 627*l.* 10*s.*; that he had paid only 100*l.* to the sheriff, and had given him his judgment bond for the remainder, which remainder the defendant had not paid for several years after the sale to *Selin*.

In the course of the exhibition of this and the preceding evidence, the plaintiff's counsel offered *Jacob Kendig*, the husband of *Mary Snyder*, as a witness, he having first executed to *Anthony Snyder* a release of all interest of dower or otherwise in the land in dispute. But the defendant's counsel objected, and the Court, who sustained the objection, sealed a bill of exceptions.

To rebut so much of the plaintiff's objections as were founded on evidence *dehors* the record, the defendant then offered evidence, 1. To discredit the witnesses of the opposite side, who had sworn as to *Selin's* conduct and declarations. 2. To explain the circumstances in relation to the defendant's possession, and non-payment of *John Snyder's* debts.

With a view to the *first* object, they offered among others the deposition of *John Miller*, which stated that he as

1814.

Lessee of
SNYDER
et al.
*v.*
SNYDER.

sheriff of *Lancaster* county, had the real estate of *Bower* under execution, and a *ca. sa.* for his body, at the time of his asserted intention to purchase at the sale; and that he went with him to the sale. That *Bower* never told him after the sale, that he would have given more for the land, if he had not been prevented by *Selin.* Then followed the question to the witness. Question. " Did said *Bower* assign to you as a rea- " son why he would not bid more for the isle of *Cue,* because " he could buy *Willing's* land adjoining *Kendig's,* for 3*l.* per " acre, and that on yearly instalments, which in his opinion " was equally good with the isle of *Cue?*" Answer. " He " did tell me so, but I cant tell at what particular time." *Miller's* deposition also stated, that a certain half an acre, of which the defendant was possessed, was excepted out of the sale by the administrators, although contained in their deed to *Selin.* To this deposition the plaintiffs objected, but the Court received it, and sealed another bill.

On the *second* branch of the defence, the defendant's counsel offered, 1. An arbitration bond between *John Snyder* and his brother the defendant, cancelled, and an award in the defendant's favour, by which he became entitled to part of the land included in the ejectment, and a survey of the piece in question referred to in the award, in conformity to which *John Snyder* in his life-time executed a deed. 2. Certain judgments against *Peter Weiser* (the owner of the premises when purchased at sheriff's sale by *John Snyder*) prior to that under which the sheriff sold; in consequence of which judgments, and the insolvency of the sheriff, the defendant was obliged to use great caution in paying the balance due by *John Snyder.* To these documents the plaintiffs also objected; but they were admitted, and other bills of exceptions sealed.

In conclusion the Court left the case to the jury as to all matters of fact, expressing at the same time a very strong opinion in favour of the defendant. On the matters of law, they charged that there was sufficient evidence that all necessary forms had been complied with, and that if not, the decrees of the Orphans' Court ordering and confirming the sale, were conclusive until reversed upon appeal; but that if *Selin* prevented bidding at the sale, and thereby injured it,

or if the defendant was a secret purchaser of part, the sale was void. The charge was also excepted to, and the jury found for the defendant.

In this Court the cause was argued upon the same exceptions in point of law, which had been urged below, with the addition of the exceptions to evidence rejected and admitted, and those to the charge of the Court.

*Fisher* and *Watts* for the plaintiff in error.

*Duncan* contra.

TILGHMAN C. J. The record in this case contains five exceptions to the opinion of the Court of Common Pleas of *Northumberland* county. The four first are upon points of evidence, the last to the charge of the Court.

1. The first exception was to the rejection of *Jacob Kendig*, a witness produced by the plaintiff. Before he was offered, he released all interest which he might have in right of his wife, or otherwise. The objection to *Kendig* is, that if the sale is set aside, his wife will have a right of dower. To this it is answered, that the wife has no immediate interest in the suit, nor could she give the verdict in evidence in an action of dower to be brought by her against the plaintiffs. In support of this are cited two cases from *Johnson's Reports*. *Jackson* v. *Bard*, 4 *Johns.* 230, and *Jackson* v. *Van Dusen*, 5 *Johns.* 147. In *Jackson* v. *Bard*, the widow was clearly disinterested, because she had joined her husband in a deed which barred her dower; so that it was indifferent to her, whether the heir of her husband recovered or not, and that was one of the reasons, (and it appears to me the principal one) which governed the Court. *Jackson* v. *Van Dusen* seems to have been decided on the authority of *Jackson* v. *Bard*, and therefore it may be that the point was not thoroughly considered. There is privity of estate between Mrs. *Kendig* and her children, who are heirs of her husband. She is interested therefore in the verdict. If the plaintiffs recover, the land will be re-sold. From the great rise in value, it is *certain* that it will sell for much more now than formerly, consequently the estate of *John Snyder* will be increased, and the Orphans' Court will allow to Mrs.

<div align="right">
1814.

Lessee of
SNYDER
et al.
*v.*
SNYDER.
</div>

*Kendig* in lieu of dower, an annuity equal to the interest of one third of the increase. In the proceedings which take place in the Orphans' Court, in consequence of that sale being set aside by this verdict, the Court will not only receive the verdict as evidence, but make it the foundation of the proceedings. When the land reverts to the estate of *John Snyder*, the administrators may petition for a new order of sale, to enable them to do justice to all parties concerned, and when the new sale is made, Mrs. *Kendig* will receive her proportion of the gain in the manner which I have mentioned. *Jacob Kendig* therefore stands in the situation of a person who has no interest himself, but whose *wife* has an interest to take effect after his death. During his own life he has released every thing which his wife would be entitled to receive; but he cannot release that which may accrue after his death. There remains therefore an interest in the wife, which she may either convey or release by an *immediate deed*, provided her husband joins her. A husband thus circumstanced is an incompetent witness, not because of interest, but because of the policy of the law, which excludes husband and wife from testifying, where the rights of either are concerned. Much of the happiness of society depends on the intimacy of husband and wife. The law considers them as *one*, and will not suffer their union to be *broken* or even put to hazard by testifying against each other. As to testifying for each other, it would be so manifestly improper, that there needs no argument on the subject. I am opinion therefore that the Court was right in rejecting the evidence of *J. Kendig*.

2. The next exception was to the admission of certain papers offered in evidence by the defendants, viz. arbitration bonds between *John Synder* deceased, and *Simon Snyder* the defendant, an award of arbitrators, and a draft of a piece of land referred to in the award. There needs but to state the case in order to shew that this evidence was properly received. The plaintiffs asserted that the defendant was a secret partner in *Anthony Selin's* purchase. After the death of *Selin*, the defendant came into possession; hence might arise a presumption unfavourable to the defendant. It was incumbent on him therefore to account for this possession, which he did in part by the papers alluded to in

this exception. The arbitrators made an award by which the defendant became entitled to part of the land included in this ejectment. The Court was right therefore in receiving the evidence.

3. The next exception was to the admission of the records of sundry judgments against a certain *Peter Weiser*. This also will appear to be clearly right, when the circumstances are explained. The plaintiffs objected to the conduct of the defendant in not making payment of the debts of *John Snyder* for a considerable time after his land was sold. The objection was answered as follows. *John Snyder* had purchased the land in dispute of *Peter Weiser*. There were several judgments which bound *Weiser's* land prior to *Snyder's* purchase. *Snyder* was indebted to the estate of *Weiser* in a considerable sum, part of the purchase money, for which judgment was obtained against his adminstrators. The sheriff of *Northumberland* county was insolvent, and great caution was necessary, lest the payment made by *John Snyder's* administrators should not be applied to the discharge of the judgments which bound the land. This was the excuse offered on the part of the defendant, and it was right that he should be allowed the opportunity of proving his allegations.

4. The fourth exception goes to the deposition of *John Miller*. At first it was said that the notice of the taking of this deposition was not legal, but as that objection was waived on the argument, I shall say nothing of it. Several particulars in the deposition itself were then excepted to. 1st. The witness swore, that in the sale by the administrators of *John Snyder* to *A. Selin*, there was an exception of half an acre the property of *Simon Snyder*. It is said that the half acre is included in the deed from the administrators (of whom *Miller* was one) to *Selin*. If so, the evidence was improper, because it was in contradiction of the deed. 2d. The witness had formerly been sheriff of *Lancaster* county, and swore that he had the real estate of a certain *Michael Bower* under execution while sheriff, and also his body, by virtue of writs of execution issued from the courts of *Lancaster* county. This evidence was also improper; it should have been proved by the records that such executions had been issued. 3d. One of the questions proposed

to the witness was objected to as a leading question. I think the objection was good. The question was so framed as to indicate particularly the answer which the plaintiffs wished. Instead of asking the witness whether he had heard *John Bower* say any thing, and what, on a certain subject, the words were put into his mouth; viz. " did he assign to " you as a reason why he would not bid more for the isle " of *Cue*, that he could buy *Willing's* land for 3*l.* an acre, " and that on yearly instalments &c.?" I am of opinion therefore that the plaintiffs in error have supported their exception to *Miller's* deposition.

5. The last exception is to the charge of the Court. In all respects but one I think the charge was correct. The conduct of *A. Selin* at the sale was submitted to the jury, and they were told that if in their opinion it was such as to deter others from purchasing, the sale was void, and the verdict should be for the plaintiffs. They were likewise told that if the defendant was secretly concerned in the purchase, the sale was void, because the defendant being authorized together with the other administrators, to sell the land by order of the Orphans' Court, could not lawfully be the purchaser; and although he was concerned but in *part*, it was sufficient to vitiate the *whole*. So far the charge was as favourable to the plaintiffs as they had any right to ask. But the plaintiffs insisted further, that the Orphans' Court had no power to order a sale, because no inventory had been returned, nor was it proved to the Court that there was not personal estate of *John Snyder* sufficient to pay his debts. It was matter of controversy on the evidence, whether an inventory had been returned or not, and whether there was not sufficient proof that the personal estate fell short of the debts. On both these facts the Court expressed their opinion in favour of the defendant, leaving them however to the decision of the jury. This was doing no more than the Court had a right to do; but they went on to say that at all events, the sale having been made by order of the Orphans' Court, and afterwerds confirmed, could not be questioned in an ejectment, but stood good until reversed on an appeal. The law is clearly not so. The Orphans' Court is not a court of general jurisdiction, and with respect to the sale of lands they have no other power than is conferred by act of assem-

bly. It might be more convenient, and render the law more uniform, if those proceedings were reversible only on an appeal; but after the long practice which has prevailed of inquiring into those proceedings in actions of ejectment, it is too late to attempt an alteration. It is unnecessary to dilate on this subject, as we delivered our opinions explicitly in the case of *Messenger* v. *Kintner*, 4 *Binney* 97. I think it however proper to remark, that although the proceedings of the Orphans' Court may be reversed in an ejectment, yet as much property depends on those proceedings, great allowance should be made for the informal manner in which they have been conducted, especially where the titles acquired under them, have been accompanied with long possession. On the whole my opinion is, that the judgment in this case should be reversed, and a *venire facias de novo* awarded.

YEATES J. The importance of some of the principles agitated in this cause, has induced the Court to continue the matter under advisment. To me it appears, that the fate of many titles is involved in our decision.

Several questions of evidence have been raised on bills of exceptions sealed at the trial. The first respects the overruling the testimony of *Jacob Kendig*, who intermarried with *Mary* the widow of *John Snyder*, under whom both parties claim. It has been contended that he was no legal witness, upon the grounds of interest, and of public policy. Upon the score of interest, it has been urged, that although he has released all his claim in right of his wife to her dower in these lands, his wife has not joined in the release: consequently a future interest will accrue to her on the event of her surviving him, and she is to be viewed as a remainder man: that she must necessarily be benefited upon such event arising, if the sale made in pursuance of the order of Orphans' Court can be invalidated: that it was admitted on the trial, that her former husband died seized of the premises, and she claiming under him an excrescence from his estate, has a privity of estate with the plaintiffs his children, and may give the verdict in evidence in a suit brought for her dower.

I answer that the husband certainly cannot give testimony

in favour of his wife, in a question where her separate interest is concerned; yet *that* interest of the wife must be certain and *positive*, not merely *possible* and *contingent.* What the law looks upon as interest, is, where there is a *certain* benefit or disadvantage attending the consequence of the cause one way. *Gilb. Law Evid.* 120. Lord *Hardwicke* has stated explicitly in *Rex* v. *Bray, Hardw. Cas.* 359, that if a witness can answer fully on a *voir dire* that he is not to gain or lose by the event *of the particular suit*, he must be a witness. A juror must stand absolutely indifferent as he stands unsworn; but a witness need not be so. A creditor may be a witness in a suit brought against a stranger by his debtor, although the money so received may enable such debtor to satisfy the creditor. He may be examined as a witness to prove fraud in his debtor, who has applied for the benefit of the insolvent act. 2 *Dall.* 268.

The contingency of the wife surviving her husband is highly uncertain; and although I admit that she may be considered, on that event happening, interested *in the question* in this suit, yet *that* is not such an interest as will exclude the husband from giving testimony, according to the uniform current of the modern authorities, which we have fully adopted. In *Baker* v. *Arnold*, 1 *Caines* 276, Mr. Justice *Kent* observes, that it has been the bent of the Court for a century past to enlarge the rule respecting the competency of witnesses. It must be a *present and vested*, and not a *future and contingent* interest, that excludes a witness. He must be interested *directly* in the event of the cause, and not merely *in the question put.* The rule is that if the witness will not gain or loose by the event of the cause, or if the verdict cannot be given in evidence for or against him in another suit, the objection goes to his credit only, and not to his competency. Such have been the principles of decision in this Court in a great variety of cases. I do not see how the verdict in this case could be given in evidence by Mrs. *Kendig*, in any future suit she might bring for her dower, in case she survived her husband. The cases of *Jackson* v. *Bard*, 4 *Johns.* 230., and *Jackson* v. *Van Dusen* 5 *Johns.* 158, are express authorities in point. There are many cases where, though the tendency of a man's evidence be to promote his own advantage, or to give him a certain

reward, yet he is a competent witness. When the interest is very remote it shall not disqualify the witness. 1 *Stra.* 575. *Espin.* 705.

It has been moreover insisted, that if *Kendig* was not excluded from giving testimony on the ground of interest, he would be repelled on a system of public policy, which forbids husband and wife from being witnesses for or against each other. Admit this to be the basis of the doctrine of evidence as applicable to persons in a married character, what discord or enmity could flow from the husband testifying *favourably* to the pretensions of the plaintiff? That he is not himself interested in the event of this cause, I have already shown, and that his wife may *by possibility* hereafter become interested in the *question* I have admitted. That the feelings or wishes of the witness might be strongly embarked on the side of the plaintiffs, I have little room to doubt. But such is uniformly the case, as between parent and child, and our nearest connexions in life, whether formed by nature, by choice, or by habit. The law knows no scale whereby influence may be measured, but refers the credibility of witnesses with all their prejudices and prepossessions, to impartial persons, under the proper remarks of the Court, adapted to the circumstances of each particular case.

I find in the Supreme Court of Appeals in *Virginia*, in 1806, the case of *Baring* v. *Reeder*, reported in 1 *Hen. & Munf.* 154, which appears to me very similar to that under consideration. It underwent the fullest argument both at the bar, and on the bench, and all the authorities on the subject in the books seem to have been fully ransacked. The majority of the Court then established the broad principle, that in suits in which the husband is not *immediately* and *certainly* interested, but may be so *eventually*, the wife is a competent witness. Her credibility can be weighed by the jury alone.

I have been more minute on this point of evidence, as I presume from what passed during the argument, I shall be found here in the minority. But I am imperiously bound to declare my own opinion, and the reasons which influenced it.

I regard the arbitration bond, award, and survey by *William Gray*, which have also been excepted to, as legal and

relevant evidence in this cause, and that they properly went to the jury.

The plaintiffs attempted to establish that the defendant came into possession of the premises, under the sale by the administrators of *John Snyder*, founded on the order of the Orphans' Court; and that he was concerned with *Anthony Selin* in the purchase. Hence fraud was inferred which would vitiate the sale. It was therefore incumbent on the defendant to prove that his possession was derived from a different source, and that he came in under a deed from the intestate to himself and *A. Selin*, for 82 acres 50 perches, (part of the original tract) dated 23d *February* 1787, executed in pursuance of an award by men mutually chosen to settle the controversies between them respecting this property. The arbitration bond and award were *functi officiis*, when the deed was given in pursuance of the award, which though cancelled, ought to be proved by a subscribing witness as well as other deeds. *Peake's Evid.* 64. These documents formed the original ground of the deed; and shewed powerfully, that the transaction in this particular was perfectly fair. The award referred to the survey of a particular date made by *William Gray* the umpire, and the whole proceeding in its various stages was correctly brought before the jury, for their decision on the *toute ensemble*.

In the same light I view the judgments against *Peter Weiser*, a list whereof was exhibited to the jury, but likewise excepted to. *John* Snyder had purchased his lands at sheriffs' sale for 637*l.* 10*s.* He had paid no more than 100*l.* of the purchase money, and had given his judgment bond to the sheriff for the residue. On the part of the plaintiffs it was contended, that there was no necessity for a sale of these lands, and that the sale was hurried with undue precipitation. To repel the force of these remarks, it became material to shew the pressure on the estate of *John Snyder* from different quarters, and that the judgment creditors of *Weiser*, whose lands had been sold to the intestate, and the consideration money had been unpaid, would be peculiarly urgent for their demands. To form a correct judgment of the merits of the plaintiffs' claim, we must transport ourselves back to the period of the death of their father, and consider the true state of his debts and credits, and the

situation of his family at the time. No arguments injurious
to a purchaser can be deduced from the rapid rise of lands
since that era, if the sale was in itself necessary, and the
proceedings were regular and fair.

I consider the supplemental depositions of *John Miller*,
as containing matters not properly the subject of parol evi-
dence. The intention of the administrators of *John Snyder*
in their deed to *A. Selin*, must be collected from their writ-
ten expressions, and not from circumstances *dehors* the
writing. The executions issued against *Michael Bower* one
of the plaintiffs' witnesses, should be proved by certified
copies; although his identity might be established by parol
evidence. As to one of the interrogatories being leading, I
content myself with observing that it ought to have been
excepted to at the time. Such was our determination in
*Sheeler* v. *Spear*, 3 *Binn.* 130.

I proceed to the charge of the president of the Court of
Common Pleas, which is said to be erroneous in several
particulars. In so doing, I hold myself bound by the facts
of the case, as necessarily found by the verdict of the jury.
The reasoning of the Court, and the legal conclusions drawn
by them, must be judged of from the facts stated in the
charge. Should we suppose those facts to have been incor-
rectly stated, we cannot as a court of error revise them.
We must bear in mind that if the court below have given a
right judgment, though for a wrong reason, it ought never-
theless to be affirmed. 1 *Munf.* 557.

The proceedings in the Orphans' Court having been
warmly impeached, it becomes necessary to state them
minutely. [His honour here stated the facts.] To these dif-
ferent proceedings several objections have been taken; and
the plaintiffs' counsel have insisted that the course of
descent was not broken, unless all the provisions of the
seventh section of the old act of 1705, " for the better set-
tling of intestates' estates," (1 *Dall. Laws Append.* 45,) have
been *strictly* complied with; and the words " then and in
every such case, *and not otherwise*." have been much relied on.

1. It has been objected that the original petition was not
signed by all the administrators; and the law requires the
act to be done by all. To this it is a sufficient answer to say,
that they all joined on the 5th *October* 1790, in an applica-

tion to renew the order of sale, and acted under it. The law does not require a petition, although such has been the practice: but only an exhibition of certain accounts, shewing the necessity of a sale. Here the maxim applies: " *omnis* " *ratihabitio* retrotrahitur et mandato equiparatur." *Co. Lit.* 207.

As to the words *and not otherwise*, in this 7th section, I will observe in my outset, that instead of the literal and strict construction of the words as now contended for, they were very liberally expounded by *M'Kean* Chief Justice, at a full court, in the case of *Humphrey Fullerton* at *Chambers-burgh*, after solemn argument in which I was counsel, by deciding that the Orphans' Court had power to direct a sale for payment of debts, although there were no minor children to be maintained; and within my own knowledge, several sales have been ordered in like cases, in pursuance of that decision.

2. The want of an inventory and administration account to warrant the sale, have been strongly pressed in the argument, as radical defects.

In fact, the original inventory was given in evidence, though the judge erred in stating that it was not filed till after the sale. There can be no reason to doubt that it was filed on the same day the letters of administration issued. We well know that in the country, the giving of bond, taking out letters of administration, and filing the inventory, are frequently simultaneous acts, done at the same time to save the trouble and expense of another journey to the county town. Why did the register himself make the memorandum on the inventory, that it was taken and appraised 19th *May* 1787, by *Swineford* and *Weyrick* duly qualified for that purpose? It is true, he ought to have endorsed on the paper when it was filed. But shall purchasers at fair public sales be affected by the unskilfulness or negligence of the proper officer? But suppose that no inventory had been filed previously to the order of sale, would not an honest statement of the amount of sales of all the goods, and an estimate of *choses in action*, be a substantial compliance with this part of the act? The object of the legislature was, that the lands of an intestate, or such part thereof as should be necessary, should be sold to enable the administrator to pay debts and

maintain the minor children, in case there should not be per-
sonal estate sufficient to effect these purposes. By adding
the advance of sales to the conscionable appraisement, the
true state of the intestate's affairs is disclosed to the Court.
The words of the law of 1705 are, " that the Orphans'
" Court shall not allow or order any intestate's lands or
" tenements to be sold, before the administrator requesting
" the same, doth exhibit one or more true and perfect inven-
" tories, and conscionable appraisement of all the intestate's
" personal estate whatsoever, and also a just and true ac-
" count upon his or her solemn affirmation, of all the intes-
" tate's debts, which shall be then come to his or her
" knowledge," &c. The act by no means requires the re-
gular settlement of an administration account, which cannot
be done without sufficient assets, but only a true account of
the debts known to the administrators. If it appears on the
facts disclosed to the Orphans' Court, that the debts cannot
be discharged, and the children brought up without selling
the lands, and they are fully satisfied on those points, their
powers are called into full exercise.

I am uninformed of the particular circumstances of the
case of the lessee of *Larrimer and wife* v. *Irwin*, cited in
4 *Binn.* 104; but if the order of the Orphans' Court was
therein declared to be void, because at the time of the de-
cree no administration account was settled, I never can be
brought to assent to that decision. Neither the policy nor
the words of the law demand this construction; and I have
no hesitation in asserting, that in the counties wherein I
have practised, at least nineteen cases out of twenty of sales
under the orders of Orphans' Courts, would be avoided,
should that doctrine be established.

3. It was further objected that *Simon Snyder* alone was
sworn to the truth of the accounts by him exhibited in the
petition for a sale. It is not unusual for the acting adminis-
trator to conduct the proceedings. The defendant was on the
spot, and *Miller* lived about eighty miles distant from the
scene of action. The widow could not be supposed to be well
informed in business of this nature. *Simon Snyder* appears
through all the proceedings to have been the acting admi-
nistrator, and on the 28th *October* 1805, settled by himself
the administration account of all the transactions in *North-*

1814.

Lessee of
SNYDER
et al.
*v.*
SNYDER.

umberland county. From all the administrators joining in the application for the renewal of the order of sale—actually selling under it—executing a deed to the purchaser—and confirming it by their solemn acknowledgments at three different times, I feel myself bound to presume that they all saw the necessity of selling the lands, and previously agreed to apply for the order of sale. From the circumstance of the names signed to the original petition being in the handwriting of *Simon Snyder*, (which it was incumbent on no purchaser to examine) it is most highly probable, that he alone was present when the Orphans' Court made the order; and if that court was satisfied of the correctness of the statement verified by his oath, I think the order to sell may well be supported.

4. The return of sale not being signed by the administrators, forms the last exception. The law only requires, " that the " administrator who makes such sale, shall bring his or her " proceedings therein to the next Orphans' Court after the " sale made." The Orphans' Courts are the proper judges of their own modes of practice. The return is only evidence of what has been done under the decree, and that the administrator had proceeded agreeably thereto. The sale is submitted to the Court for their approbation. Here the Court have acted judicially on the unsigned return, and have ordered the sale to remain firm and stable for ever. The recitals in the deed to the purchaser abundantly supply any seeming defect in this part of the proceeding.

I cannot avoid remarking, that the exceptions which I have considered, furnish striking proof of the propriety of applying to professional men to transact matters of this nature. It is the most ill judged economy to intrust business in courts of justice upon which the titles to lands depend, to men unskilled in such subjects.

I am under no difficulty when I assert the charge of the Court to be erroneous, in declaring in broad and general terms that the final determination of the Orphans' Court on the sale was *conclusive*, until set aside upon an appeal or other removal to a superior court. Indeed as to this point, the subsequent part of the charge is manifestly contradictory; because it is particularly submitted to the jury to decide, whether the sale was materially injured by any improper conduct of *Anthony Selin*, and whether *Simon Snyder* was

interested with him in the purchase of the lands, in either of which cases the jurors were instructed that the sale ought to be declared void. What effect the general proposition abovementioned would have on the minds of the jurors, I will not venture to determine; but that it might distract the attention from the true merits of the case is within the range of possibility.

I have already expressed my sentiments upon the exceptions taken to the proceedings in the Orphans' Court, and have spoken with freedom of the case of *Larrimer's Lessee* v. *Irwin*. Upon the fullest reflection, I do not feel disposed to retract any part of the opinion which I delivered in *Messenger et al.* v. *Kintner*, 4 *Binn.* 105. 107. I consider the general remark to be correct, that the decree of the Orphans' Court in a case within their jurisdiction is reversible by appeal only, and not collaterally in another suit. The settled rule is, that the merits of a judgment can never be contested by any original suit either at law or in equity. 2 *Burr.* 1009., 1 *H. Black. Rep.* 294. The maxim is, *de fide et officio judicis non recipitur quæstio. Hardr.* 127. But in *Messenger* v. *Kintner*, the defendant in error, a minor somewhat about nine years of age, was attempted to be bound by proceedings unsanctioned by law or justice, to which neither he, his guardian, nor next friend were parties. It was *res inter alios acta*, and no presumption could be formed in favour of what was done. I assimilate the present case to a sheriff's selling land, which he has taken in execution by process of law. The judgment concludes all irregularities in the previous proceedings, except where the plaintiff in the execution becomes the purchaser. *Goodyer* v. *Junce, Yelv.* 179. But the sale must be fair and just in itself, uninfluenced by threats or violence. The officer cannot sell to himself. *Fraud will vitiate any act whatever.* Here the lands have not been aliened by the first purchaser, but remain in his children, whose guardians have leased to the defendant. The true merits of the case rest on the honesty and fairness of the public sale, and may be fully contested in the present suit.

Upon the whole matter I am of opinion that the judgment below be reversed, and a new trial be awarded.

BRACKENRIDGE J. accorded in opinion with the Chief Justice.

Judgment reversed.