*J. A. Bayard* and *J. M. Clayton*, for appellant.
*Frame*, for appellee.

---

JAMES ROACH, deft. below *vs.* The lessee of JAMES MARTIN, plff. below.

A devise "to A and her heirs forever *except she should die without an heir born of her own body,*" then over to B is an *estate tail* in A with a *vested remainder* in B, and not a contingent fee with an executory devise.

An order of the orphans' court directing a sale of lands for the payment of debts is conclusive as to every matter necessary to the making such order; and such matter cannot be enquired into collaterally in any other proceeding.

Under the old act of assembly the record of a deed was, by the settled practice of the courts, permitted to be read in evidence, though such deed had not been recorded within a year from its execution.

WRIT of error to the superior court—Sussex.

*Coram*—Johns, Jr. chancellor, Black and Robinson.

This cause was argued by *James A. Bayard* and *Clayton* for appellant and *Frame* for the respondent, on the three points presented and decided by the court below. See, *ante* 477, &c.

The counsel for the appellant contended that the judgment of the court below was erroneous:—

First. In permitting to be read in evidence the proceedings had in the orphans' court for the sale of the land of Hannah Heavilo, on the petition of Benjamin Johnson, executor of John Heavilo who was the executor of the said Hannah Heavilo.

Second. In admitting as evidence the record of the deed from Benjamin Johnson, executor of John Heavilo who was executor of Hannah Heavilo to Mary Fergus; the said deed not having been recorded within one year from its execution.

Third. In construing the devise to Eliza Fergus, in the will of the said Mary Fergus, to be an estate tail with remainder in fee to James Martin; and not an estate in fee with an executory devise over.

*Mr. Justice Black* delivered the following opinion of the court:

*Black Justice*—

"It is a rule of law now well established that a devise to a person and his heirs, with a remainder limited over, if the devisee dies without issue or heirs of the body, is a fee reduced or narrowed to an estate tail, and that the devise over is, (when such words are used) to take effect after an indefinite failure of issue and is void by way of executory devise, as being too remote. Although the immediate devise imports a fee (the word *heirs* being introduced) it is restricted or controlled by the words subsequently used in the will manifesting the design of the testator to limit the operation of the word "heirs" to those of the *body*, and to give to the devisee an estate tail instead of a fee. This rule is not denied in the argument on the present occasion, and will be found to be sustained by the subjoined authorities. 6 *Cruise* 202; 5 *Term* 335; 7 *Term* 276; 9 *East* 382; 12 *East* 254; 4 *Maule & Sel.* 62; 1 *Com. Law* 379; 5 *Com. Law* 373; 4 *Kent's Com.* 200, 274-6.

Did Eliza Fergus take, in the lands devised by the fourth clause of the will, an estate in fee, with a limitation over, which would be good by way of executory devise, to James Martin according to the settled principles of law; or did she take an estate tail, with a remainder over to James Martin contingent on the event of her issue or heirs failing.

It is admitted on the part of the counsel of the plff. in error that if the words "except she should die without an heir born of her own body," import an indefinite failure of heirs of the body of Eliza Fergus, and not a failure of heirs at the period of her decease, that then Eliza took an estate tail. But if, as they insist, the limitation over to James Martin was to take effect only on the event of Eliza Fergus dying without having had an heir born of her own body, or without having an heir born of her body, living at her death, that then the contingency on which Martin was to take was determined at the death of Eliza, and that the limitation to him would in that case be sustained as a valid executory devise, and Eliza held to have an estate in fee in those lands.

The term "heir" has assigned to it by judicial determinations its appropriate, peculiar and technical import and meaning, and that import and meaning it is to receive unless there is something in the will clearly excepting it from this general rule, and showing that when used it was designed that this technical import should not be applied to it. In its legal import or signification it is not a word of purchase, nor a designatio personæ, but is nomen collectivum, and used as a word of limitation, and will carry the land devised not only to the immediate heir or issue, but to all those who descend from that devisee. It is immaterial whether the term "heir" or "heirs" be used, as the law has assigned to each of these the same import, and they each embrace the same class—all the lineal descendants of the original stock or root. *Croke Jac.* 145; *Croke Eliz.* 313; 2 *Vernon* 449; 5 *Term* 335; *Har. & But.* notes *p.* 9, note 45. In Burleys case reported in 1 *Ventris* 230; 4 *Bac. Ab.* 260; there was a devise to A. for life, with remainder to the *next heir* male, and for default of such *heir* male, the remainder over, which was adjudged to be an estate

tail, on the ground that the word "heir" was nomen collectivum and carried the estate not only to the immediate heir or issue of A. but to all to those who descended from him.

In *Whiting* vs. *Wilkins*, 1 *Bulstrode* 219 which was a devise to one forever, and after his decease to his *heir* male forever, it was held, that "heir male" and "heirs male" are all one and the same, because "heir" was nomen collectivum, and that the devisee took an estate in tail male. In the case of *Hales Les.* vs. *Vandegrift*, reported in 3 *Binn.* 374; a devise to A. and his lawful begotten "heir" forever, was adjudged to be an estate tail, the term "heir" being nomen collectivum. In the case of *Osborne* vs. *Shrieve et. al,* 3 *Mason* 391; (*Cox's digest* 254) a devise to A. and his heir male and to his heirs and assigns forever, but if A. should depart this life leaving no male *heir* lawfully *begotten of his body,* then to B. in fee, was held an estate in tail male in A. with a remainder over to B. As nomen collectivum the term "heir" therefore in its technical import, is a word of limitation and not a word of purchase, or discriptio personæ. In this latter sense it is sometimes used when the manifest intention of the testator requires that it should be so used, but only when words of limitation are superadded to the term "heir," showing that the testator intended the "heir" to be the root of a new inheritance or the stock of a new descent. The term "heir" thus used describes the *person* from whom the inheritors of the land are to issue, and such "heir" takes not by descent from his parent, but by purchase and by direct devise under the will. He is the root or stock of the inheritance and descent and the parent is not the root or stock from which the descendants or heirs are to issue, To effect this change of the technical import of the term "heir" there must as we have said be superadded to it words showing the intent of the testator that this "heir" was to be the root of inheritance, as in Archer's case 1 *Coke* 66, cited by the counsel for the plff. in error, where the limitation was to A. for life and to the next *heir* male and *to the heirs male of the body of such next heir male.* By superadding the words " to the heirs male of the body of such next heir male" the testator showed that he designed the "heir" before mentioned to be the root from which the heirs were to issue to whom the land should go. So also in the case of *Clark* vs. *Day,* in *Croke. Eliz.* 313, which was a devise to a daughter for life, and if she have heirs lawfully begotten, then the daughter's *heir* should have the land after the daughter's death, *"and the heir of such heir."* These latter words point to the daughter's *"heir"* as the root or stock; makes that term a designatio personæ and that *heir* to take by purchase under the will and not by descent from its mother. So also in the case of *Luddington* vs. *Kime,* 1 *Lord Raymond* 203, 1 *Salk.* 224, where lands were devised to Evers Armyn for life, and in case he should have any issue male, then to such *issue male and his heirs* forever. Issue in this case, in order that the intention of the testator might take effect, had not its technical import (a collective one signifying all the descendants,) but it was held as denoting a particular person from whom the *heirs or issue* were to spring and was taken as a word of purchase. Cases of a like complexion may be found in 1 *Ventris* 230; 1 *Strange* 12; *Croke, Eliz.* 453;

4 *Kent's Com.* 220; 1 *Fearne on Rem.* 227, 234, 242, 279, 283; *Powel on Dev.* 360.

In all these cases the first devisee took an estate for life and not one of inheritance, and we are not aware of any case in the books, where the first devise was in fee, that the technical import of the term heir or issue, has been held as a word of purchase, even where words like those referred to have been superadded. We cannot, therefore, under an inspection of this will hold the term heir to be a description of the person who was to take, or a word of purchase, as urged by one of the counsel for the plff. in error. There are no words superadded pointing to this "heir" as the root of inheritable blood or giving her the character of a taker by purchase; on the contrary to the parent of this *heir* was given an estate of inheritance "except she died without an heir born of her own body." If she died leaving "an heir born of her own body," her estate of inheritance was not defeated but remained in her, and at her decease passed by descent to such heir and not by purchase.

The stress of the argument for the plff. in error, however, was on the words "except she should die without an heir *born* of *her own* body," which are used in the devise to the daughter Eliza Fergus in the fourth clause. They contend that by the peculiar language used— *born* of her *own body*—the testatrix intended to use the term heir not in its technical sense as a collective term embracing all descendants, but in a personal or individual or restricted sense, and that the term "heir" was to be confined to and embrace only the individual designated and not the descendants of that heir—in other words that *heir* was to be construed as if the term "child" had been used.

The words heir of the body; heir lawfully begotten of his body, (3 *Mason* 391; 1 *Fearne* 242;) heirs of them on *their* bodies lawfully (8 *Term* 211) have all been held to mean one and the same thing; to begotten; (4 *Term* 605;) if both die without issue of their own bodies; describe the class, and not the person; to embrace all heirs or all issue, and all descendants. Do the words "an heir born of her own body" more particularly designate a child or an immediate descendant of the body, than do the words we have referred to, "heir lawfully begotten of the body; or "heirs on their bodies lawfully begotten" or "issue of their *own* bodies;" and yet these words have been held as embracing all the lineal descendants—all heirs or issue proceeding from the body how remote soever the descent may be.

The *heir* or *issue* of the *body* of an individual, can only be the heir or issue of that individual's *own* body—the heir or issue *born* of that individual's own body, that is, issuing from that body. The term *heir begotten on the body,* (4 *Term,* 605) is not confined to the immediate or first descendant of the body, but embraces all proceeding from that descendant; and we can see no reason why the term "the heir born of her own body," can on any principle be more restricted or confined. The language in each case is equally plain and strong and the same legal interpretation of these words must prevail. In the case of *Doe* on the demise of *Gregory* vs. *Whichelo,* in 8 *Term,* 211, where the limitation over was in the event of the son and daughter dying without issue of their *own* bodies, the term *own,* (which is also used in this will) was not considered as having any

peculiar influence, or as having any other import than the words *their bodies* would have had, or as changing the settled legal and technical import of the expression "dying without issue." The term "heir" is not less technical or comprehensive than the word *issue*, but the contrary, and yields its legal import with greater difficulty than the word issue. 4 *Term*, 299. When the words *first, next,* or *eldest* have been prefixed to the term "heir" in a will, they have not been held as sufficient to show an intent in the testator to control its technical .import, as will appear from the cases collected by Mr. Powell in his treatise on devises, page 361, 2. We can see nothing in this will which can induce us to think it was the design of this testatrix in using the word heir, to use it in any other than its settled technical sense; that is as embracing all the descendants from the body of her daughter Eliza Fergus, and not to confine it to the child of Eliza to the exclusion of a grandchild, and to allow the estate to go over to Martin, while Eliza left a grandchild living, although she might not have left to survive her a child or an immediate "heir born of her own body.."

In our judgment then the words used in this will "except she should die without an heir born of her own body," are to receive the same construction as is or would be given to the words "except she should die without heirs or issue of her body." Such words have by judicial decisions which this court must respect, received a certain fixed legal import, which should not be disturbed—they import an indefinite failure of issue—a failure of descendants of the first taker without reference to any particular time or event, and that a devise over after such an indefinite failure of issue, cannot take effect by way of executory devise, but is void, is a rule too well established and too familiar to the profession to render it necessary to refer to adjudged cases to sustain it.

If we should hold that Eliza Fergus took a fee in the lands devised in the fourth clause, we should render null and forever inoperative the limitation over to James Martin, as it could not take effect as an executory devise, being too remote. In this point therefore we should defeat the intention of the testatrix, who intended that Martin should have this portion of her real estate whenever there was a failure of issue from the daughter. Further: under such a construction James Martin would take nothing by this limitation, if Eliza died leaving a child, and that child had died without issue in an hour after its mother; and yet this is the very state of things, in which it was manifestly the design of the testatrix that this land should pass to Martin; that is, when all the issue of the daughter was extinct.

It was urged by one of the counsel for the plff. in error, that this clause gave to Eliza a fee with an executory devise over to Martin which was to be determined during the life of Eliza Fergus, or at the moment of her death, and was therefore good; that if she *had* a child *born* of her body, the limitation over was defeated even if such child or its issue did not survive her. This surely was not the intention of the maker of this will: she intended that Martin should have this land if Eliza died leaving no issue, and not that it should escheat to the State, which, from Eliza's illegitimacy, would have been the result had she died intestate, as she could have no other than

lineal heirs. So to construe this will would render it necessary most materially to change its language, and to introduce into it words which the testatrix has not placed there—in fact to make a will for her. The will is not, as the argument of the counsel would render it necessary that it should be, except my daughter should die without *ever having had* an heir born of her own body; then over, &c.: but it is except "she should die without an heir born of her own body;" that is, without leaving an heir born of her body; then over to J. Martin.

According to another view taken by the counsel of the plff. in error of this clause of the will, the daughter was to have a fee in this part of the estate if she died leaving an *immediate descendant* of her own body, that is leaving a *child*. That the executory devise over was to be decided by this event, which would make it a good executory devise within the rules of law, as it would either take effect or be defeated at the moment of the death of the daughter who was then in being that if Eliza died without leaving an *immediate descendant* of her own body, that is without leaving *a child* to survive her, the lands on her decease passed under the limitation to James Martin as a valid executory devise. If this construction should obtain, this result would in a certain state of things arise, that Martin would take this land notwithstanding a grand-daughter of Eliza Fergus was in being, which unquestionably could never have been the intention of the testatrix: if Eliza had had a child and that child should have had a child and died in the lifetime of Eliza leaving this child to survive her, such child not being the *immediate descendant* or *child* of Eliza, but her grandchild, would not on her decease be held according to the argument to be an heir *born* of Eliza's *own body*, and there being no *such heir* living at her death the executory devise to Martin would take effect, and the grand-child be excluded from all benefit or participation in this part of the estate. No one can for a moment suppose that such an intention existed in the mind of this testatrix when making this will.

It would appear from an examination of the different parts of this will to have been the design of Mary Fergus to make some difference in the nature of the estates given to her daughter, in the two parcels of land devised to her. The store house, lot and granary is devised to James Martin for ten years, and then given to the daughter in fee, without any limitation; while the lands devised by the fourth clause of the will are given to her and her heirs with a limitation over, of those lands only, to Martin in the event of her dying without an heir born of her body. This limitation does not extend to the store house, lot and granary, nor is there in the will any thing relating to it restricting it to an estate tail. Had no difference in the nature of the estates given to the daughter been intended by the testatrix, it would have been natural to have extended this limitation in favor of her friend to all the lands devised the daughter.

The intention of the maker of this will seems to be plain and free from all reasonable doubt or question, and it is the duty of this court to carry that intention into execution, unless it conflicts with some settled rule of law. Her design manifestly was to give to her friend James Martin the store house, lot and granary for ten years, and

that it should then pass to her daughter in fee simple; and to give the remainder of her real estate to her daughter in tail to be enjoyed by that daughter and the issue of her body, and that if at any time there was a failure of such issue, that such remainder of her real estate should then vest in James Martin in fee. It is an established rule of law that if a devise can take effect as a remainder it shall never be construed an executory devise. Effect can be given to this devise to Martin, according to the express design of the testatrix, if we construe this an estate tail in Eliza Fergus with a remainder limited over to him on the contingency of her dying without issue—the limitation would take effect if the issue failed, and if the issue did not fail it was not intended by the testatrix that it should take effect—on the other hand the devise to Martin will be forever defeated if we hold that Eliza Fergus took an estate in fee; as the limitation over, being on an indefinite failure of issue, could never take effect as an executory devise. To construe this a fee tail in Eliza Fergus gives full operation to all the intentions of the testatrix in favor of the several objects of her good will and in the order she designed; that is, first to her daughter, next to the issue of that daughter and then to her friend James Martin: any other interpretation would or might defeat one or other of those objects and thus frustrate one of the testatrix's designs. This construction instead of conflicting with settled principles is in perfect conformity with those which have been established by a series of adjudications, namely: that a devise in fee with a remainder over if the devisee dies without issue or without an heir, or without heirs of the body is a fee cut down to an estate tail. 5 *Term* 335; 7 *do.* 276; 9 *East* 382; 12 *do.* 254; 4 *Maul. & Selw.* 62; 1 *Com. Law* 379; 5 *Com. Law* 373; 4 *Kent's Com.* 200, 274-6.

It may be proper to notice an argument urged by the counsel for the plff. in error to this effect—That the testatrix by the fourth clause of her will devised to her daughter all the remainder of her estate both real and personal and limited over to Martin that real and personal property if her daughter died without an heir born of her own body. That under this clause the daughter unquestionably took the personal estate absolutely, and that in no event could Martin have any benefit by this limitation in relation to it, as words in a will which when used in reference to lands give an estate tail therein, will when used in relation to personal property give an absolute estate in that species of property: that it was the intention of the testatrix to limit over to Martin both the real and personal estate on the same contingency: that this intention is defeated if the words used are held to give an estate tail, but will be sustained as to both kinds of property, if they are held to give an estate in fee with an executory devise over to James Martin. We do not feel the force of this argument, or consider that it can be of any weight in the present case. It may have been and probably was the design of the testatrix to limit over to Martin both the real and personal estate, if her daughter died without issue, and this intention should prevail unless it conflicts with some fixed rule of law. If it does so conflict, the rule must prevail and the intention yield to it. The intention in this case then, as it is urged, was to give an estate in fee in both kinds of property with a limitation over, unquestionably after an indefinite failure of issue, and this

the law will sustain. The rule cannot bend to the presumed intention, or be given up to effect that intention.

In holding the words of this will to create an estate tail, the daughter takes the personal estate absolutely, not in consequence of the expressed intention of the, testatrix, that she shall so take it but because the law has established a fixed legal import to certain words when used in reference to personal estate. That if property of this species be bequeathed to a person and the heirs of his body, the legatee takes such property absolutely and not in tail. But the law has equally well established the legal acceptation of these same words when applied to real estates, that they do not in the latter case give an absolute estate or one in fee, but an estate tail. As to each species of property these words have their peculiar, appropriate, technical signification, and the subject matter determines the application to be made: if applied to land they give an estate tail; if to personal property an absolute estate; and although they be used in the same clause of a will and be applied to both real and personal estate, they are to be construed according to the subject matter to which they are applied, and the very same words in the same clause will be held to vest the one species of property absolutely, and the other in tail. Cases to this effect may be found in 9 *Vezey* 202; 6 *Term* 307; 16 *Johns.* 413; 17 *Vezey* 479.

On the trial below the counsel for the deft. objected to the admission in evidence of the proceedings of the orphans'. court of Sussex county in relation to the sale of the real estate of H. Heavilo for the paying her debts, and of the deed made pursuant to such sale by B. Johnson as executor of H. Heavilo; alledging that he was not the executor of H. Heavilo.

The sale of the land by Johnson had been returned and approved by the orphans' court.

The order and decree of the orphans' court had not been appealed from and the court below held that as to every point which it was necessary for the orphans' court to decide upon, to make a rightful order, their decree was conclusive; and that such points or matters could not be enquired into collaterally in the action then on trial. In this opinion we fully concur. To authorize or order an executor or administrator to sell lands to pay the debts of a deceased person, was a jurisdiction committed exclusively in this state to the orphans' court of the several counties, with the right of appeal to the superior court; when the order in question was made the appeal was to the then supreme court. If one died leaving a will, the orphans' court had exclusively the power to call upon the executor to account for the goods and chattels and on examination and due proof made before it, if the personal estate should be found insufficient to pay the debts of the deceased, and if the widow, children or devisees should neglect or refuse to pay their proportionate shares of those debts after a just settlement of the personal estate in that court, then to *order the executor* to sell such portions of the estate as that court might deem necessary for the payment of debts; which sales the act of assembly declared should be as available as if the lands had been sold by the decedants: and were to be made after notice by advertisements for twenty days in the hundred where the lands were situate

and in three of the most public places in the county, and return of such sale was to be made to the next orphans' court. All these different matters are essential requisites in a valid decree or to constitute a valid sale, and if any one of these points could be enquired into in the action of ejectment in the court below, all were equally open for investigation even to the advertisement of the lands for twenty days, and the refusal or neglect of the widow, heirs or devisees to pay the debts. Where sales were to be made of lands of an *intestate* it was further provided; that before an order was made, the administrator should exhibit to the court an inventory and appraisement and also an account on oath of the debts due from the intestate. These points would on the same principle be enquirable into. To order lands to be sold for the payment of debts, was a jurisdiction exclusively committed by our laws to the orphans' court. Those laws prescribed the manner in which the jurisdiction was to be exercised. Before that court could legally exericise the power delegated, it was to call the *executor* before it to account for the goods and chattels— of course it was to ascertain who *was the executor*, and compel *him* to render such account: if the personal estate was insufficient to pay the debts, and if the heirs or devisees refused or neglected to discharge them, then the court were authorised to order the executor to sell the land, to receive a return of such sale and enquire if it had been legally made; and if the lands were those of an intestate, an inventory, appraisement and list of debts were to be submitted to the court before an order could be made. It was undoubtedly necessary that all these matters should be made out to the satisfaction of that court, before it could legally make a decree to sell the land: as such an order was made by that court, are we not bound to presume that a court thus having jurisdiction has properly exercised its power and had before it all that the law required it should have before it, previous to its making such order. If these matters are allowed to be controverted, enquired into, or proof of them called for, we should in a side way, and not by the legitimate and prescribed course of appeal, review the proceedings in that court, and impeach the decree of a court of competent jurisdiction in a collateral action. We cannot adopt such a principle. It has in it the seeds of evil, and would produce confusion in our system, collision in our tribunals, and insecurity in the titles and tenure of real estate.

If a court having jurisdiction of the subject matter proceeds erroneously, its judgment or decree is nevertheless valid till reversed by the appropriate tribunal of review in the due course of law, and every person is bound by the judicial acts of such a court while they stand unrepealed. *Buller's N. P.* 244; 3 *Term* 129; *Cowper* 315; 1 *Strange* 481. An executor who has obtained letters testamentary on a forged will represents the estate until those letters are revoked, and payment made to him will discharge the debtor. This principle was decided in the case from 3 Term to which we have referred. Would it not be most unreasonable, and be paying but little respect to the judicial acts of a court to whom the matter has been by our laws exclusively confided, to hold that a person before he can with safety purchase land at an executor's sale made under an order of our orphan's court is bound to ascertain if satisfactory proof exist that

such court has pursued in all particulars, the course pointed out by law for the due exercise of its authority, and that all the requisites of a valid sale have been confirmed to, and to stand ready at all times to produce such proof whenever an individual may choose to institute an action to take from him the land he has purchased? Ought he not to be permitted to rest securely on the decree and proceedings of the court to whom the jurisdiction was entrusted, as conclusive evidence that such court has duly pursued its authority, and not acted in a way different from that which the law had prescribed that it should act.

A judgment, sentence or decree cannot be impeached on the ground that the will was forged; or that the testator was non compos mentis; or that another is executor, for this would be to falsify such judgment or decree. 1 *Stark. Ev.* 253; 1 *Strange* 481. It was a question for the orphans' court, and an essential question for it to decide, whether Benjamin Johnson, as executor of John Heavilo, who was appointed one of the executors of Hannah Heavilo, and gave bond as such, was the executor of Hannah Heavilo, and to be recognized as her legal representative; for until that court had decided that he was the executor it could make no decree authorizing him to make sale of the land. If the court erred in judgment either on the *fact* or *law*, a remedy for correction of the error was secured by an appeal to the supreme court whose decision, by our then constitution, *was final.* If the error, if any existed, is to be got at and corrected in this way in an action of ejectment, then the court of final resort is not that pointed out by the constitution for such correction. It would have been, under our late judicial system, the high court of errors and appeals, in which not a single judge to whom the constitution assigned the final decision of such matters, would have been on the bench on the final determination of the cause, if the action of ejectment had originated in the supreme court it would have been decided in the last resort by the chancellor and judges of the court of common pleas, who would have formed the court of appeals on writs of error to the supreme court; and under our present constitution the tribunal of final decision would be composed of the chancellor, the associate judge residing in the county, and one other of the judges; and yet neither of the former can sit on an appeal from the decree of the orphans' court. The court of errors and appeals would thus in effect, though indirectly, take to themselves the power of reviewing and annulling the decrees of the orphans' court, a power denied to it by our constitution, and expressly placed elsewhere.

The case of *Rockwell* vs. *Sheldon*, (2 *Day's Rep.* 305,) is an authority on the question before us and sustains the principles we have adopted. It was an action of ejectment brought by the heirs at law, in which it was attempted to impeach a sale made by an executor by order of a court of probate for the payment of debts, on the ground that all these previous matters which were necessary by the statute of Connecticut to have been done before the court of probate could make the order of sale, had not been done; that no inventory of the lands in controversy had been made, accepted and recorded as their statute required, and that therefore the sale was void. The supreme court of errors held, that they were bound to presume all these mat-

ters to have existed before the court of probate exercised its dele-' gated jurisdiction; that it would presume the court of probate had before it the inventory required; that it would presume such inventory was accepted and ordered to be recorded, and that they would not permit an averment that there was no such inventory, or that it had not been accepted or recorded, because as these were requisites such averments would impeach a decree of a court of competent jurisdiction, and that such decree could not be impeached in a collateral action. A like attempt was made to question the regularity of the proceedings of a court of probate, in relation to a sale ordered for the payment of debts, in an ejectment brought by Griswold, one of the heirs of the deceased, against Bigelow, who held under the purchase made at such sale, and which is reported in 6 *Day* 264. C. J. Hosmer in delivering the opinion of the court said, "The decrees of a court of competent jurisdiction are conclusive while they remain unreversed, on every question which they profess to decide. They can never be questioned collaterally but ex directo only." It was the proper course of the devisees and others to have,appealed from the appointment of the administrator and the order of sale, and indeed from any other exceptionable decree of probate, and in my opinion this was the only mode of reviewing any of those determinations— from this it results as far as this *court is authorized* to *decide*, that an administrator was duly appointed, the claim was legally allowed and a lawful order of sale was made.

That our views on this subject do not accord with the decisions in Pennsylvania we are aware. Their rule was adopted by C. J. M'Kean in 1798, probably in consequence of their not having a distinct equity tribunal, and succeeding judges have not felt themselves at liberty to depart from it, although it is manifest they were not satisfied with it. C. J. Tilghman, in 4 *Binn.* 104, says, "If the question was open whether a decree of the orphans' court though erroneous ought to stand till reversed by a regular course of appeal and not to be questioned in a collateral way I should think it well worthy of consideration; but after the frequent decisions by which the decrees of orphans' courts have been called in question in actions of ejectment, I am bound to consider the law settled." He again says, in 6 *Binn.* 491, "It might be more convenient and render the law more uniform if these proceedings (the orphans' court) were reversible only on appeal, but after the long practice it is too late to attempt an alteration. He yields to the rule because it has been established by repeated decisions and not because his judgment approves it. We are, however, not thus fettered. In *Larimer's lessee* vs. *Irwin*, C. J. M'Kean decided that it was the duty of a purchaser at a sale by an administrator or executor, "to see that the proceedings were so far regular as to authorize the sale." We cannot adopt a principle like this which will take from the decrees of an independent tribunal all binding force or effect. Such sales we think should be sustained to the extent that sales by sheriff's are, and that in neither case should purchasers be required to see that the proceedings prior either to the judgment of a court of law, or to a decree in the orphans' court were so far regular as to authorize a sale. Judge Yeates in 6 *Binn.* 499, says, I consider the general remark

to be correct, that the decree of the orphans' court in a case within its jurisdiction is reversible only by appeal, and not collaterally in another suit. The same judge says in 4 *Binn.* 107, in relation to sales of land made by executors by order of the orphans' court and also in relation to *assignments* by that court of the land of an intestate to one or *other of the children*, it has not been necessary in Pennsylvania to appeal in the first instance to reverse the decree, but to institute actions of ejectments, and in this way *review* the proceedings of the orphans' court. In this state such a course would virtually be a violation of our constitution, and cannot receive our sanction.

The case of *Griffith* vs. *Frazer*, from 8 *Cranch*, does not in our judgment conflict with the principle on which we proceed. A *majority* of the court ruled in that case, that an execution on the judgment which had been rendered against Lamotte the administrator cum tes. ann. could not legally be levied on the property of Salvador, and therefore that a title through it could not be conveyed to the purchaser, because the judgment was a nullity. It was admitted by C. J. Marshall that this decision was at variance with the case in 1 *Wilson*, 302. That the regularity of an execution under which a sale has been effected by a sheriff, can be inquired into collaterally in an action of ejectment, is a position we are not prepared to admit; certainly it cannot if the execution be voidable only and not void. 1 *Salk.* 273; 1 *Wils.* 302; 8 *Johns.* 361; 3 *Caines.* 271.

The court of appeals of South Carolina in the case of Ford *vs.* Travis (cited 8 *Cranch*, 14,) had decided that after probate made of a will, a grant by the ordinary of administration was void, although the executor might be absent from the state. It was established by the highest tribunal as the law of that state, that the ordinary having taken probate of a will or issued letters testamentary had no longer jurisdiction over the subject, but that it was exhausted, and that he had no jurisdiction while the executor was living to issue other letters, as he had no power to revoke or annul the letters issued. This principle was adopted by the Supreme Court of the United States in the case in 8 *Cranch*, and they declare that the administration granted to Lamotte was granted by a court having no jurisdiction in the particular case and was therefore absolutely void. *(Page* 27, 28.) Had the orphans' court of Sussex county, after having ordered and effected a sale of the land of H. Heavilo through an executor, and confirming the same, subsequently assumed a jurisdiction and a second time ordered and effected a sale of the same lands to pay the debts, the principle fixed in 8 *Cranch* might well be applied; for by the first sale and its confirmation their jurisdiction over the subject matter was at an end, and an attempt again to exercise the same power would be a nullity; an assumption of jurisdiction which they did not possess. Such however is not the case before us: by reason of the insufficiency of the personal estate of H. Heavilo to pay debts, a sale of her land was rendered necessary: the only jurisdiction to effect this was the orphans' court: to it was committed the power to call the executor of H. Heavilo before it, to ascertain the necessity of a sale and to order the representative or executor to make a sale: having jurisdiction of the subject matter,

which is the sale of the land, the order or decree of the court or the proceedings consequent thereon, though they may be erroneous are not void; they may be *voidable*, but till reversed in the due course of review, they stand with binding force and cannot be impeached collaterally. Whether letters testamentary had been issued to John Heavilo alone, or to John and Roderick jointly; whether Roderick survived John or died before him; whether if he survived he was the executor of H. Heavilo or had renounced, were matters necessary for the orphans' court to pass upon to enable it to decide whether B. Johnson as executor of J. Heavilo, was the legal representative of H. Heavilo; and we are bound to presume that the orphans' court thus having jurisdiction of the subject matter of sale, had satisfactory proof before it to justify it in the conclusion to which it did come, that he was the legal representative. If that court erred the error can be corrected by appeal only, and not collaterally in the manner it was attempted.

C. J. Marshall says at page 23 of the case in 8 *Cranch*, "tho' letters of administration be granted to one *not entitled by law* still the act is binding until annulled by the competent authority, because the ordinary had power to grant letters of administration in the case." Apply this principle and the reason of the principle to the case before us. If the orphans' court order a sale of land of a person deceased to be made by one who it subsequently appears had not complied with all those requisites which were necessary to constitute him legally the executor of the deceased, still the act of the court according to the principle stated in the case of *Griffith* vs. *Frazer* would be binding, until annulled by the proper tribunal of review; because that court had jurisdiction of the subject matter, that is of the sale of lands to pay debts, and had the power to order the sale, and their act though voidable was not void. The court below proceeded on this principle, that as the orphans' court had jurisdiction and authority to order the sale of H. Heavilo's real estate to discharge her debts, they would hold its decree as binding and not allow it to be impeached collaterally on the trial then before it. We cannot suppose that the late court of common pleas would have permitted a sale of lands made by a sheriff under process from the supreme court, to have been impeached collaterally in a trial before it by an averment that the inquisitors who condemned the land were not freeholders, or that the sheriff had not given security; and yet this question of security is one of which the common pleas had exclusive jurisdiction and not the supreme court from which the sale was authorized: the sales might have been voidable but they were not void, and therefore could not be assailed in this way.

The judgment of the court in admitting in evidence the records of the deeds which had not been recorded within a year was we think correct, when we consider the practice that has prevailed for very many years throughout each county of the state of recording deeds duly proved or acknowledged after the year, and the decisions made in at least one of our courts in allowing office copies of such to be received in evidence; we fear we should be unsettling the titles to much of the real property of the state, were we to adopt a different rule from that of the court below inasmuch as the supreme court for at least

thirty years had recognized by their decisions as competent evidence deeds so recorded. We go on the decisions thus made establishing a rule of property which it is not wise now to shake, and the practice that it gave rise to or recognized, and not on the words of the act of assembly, which might well bear a different construction: besides the admission of deeds thus recorded, or copies thereof in evidence, though not within the words of the act extending the time for recording deeds; (8 *Del. Laws* 19) and the supplements thereto is, we apprehend, within the spirit and design of those acts: under those acts all deeds proved or acknowledged in the manner prescribed by the laws of the state could be recorded and copies thereof be evidence, no matter when executed. Had these deeds been placed on record subsequently to the passing of those acts, there would have been no question on this point: as they were recorded previously thereto, having been duly proved, we think the spirit and object of the act are promoted by recognizing them as valid records.

We are therefore unanimously of opinion that in the judgment of the court below there is no error, and that it must be affirmed.

Judgment affirmed.

*Bayard and Clayton,* for plaintiff in error.
*Frame,* for defendant in error.