The cases were tried together, depending on the same devise in the will of Mary Fergus. The devise was as follows: — *Page 478 
Fourthly. I give and bequeath unto my beloved daughter ElizaFergus the remainder part of all my real and personal estate to herand her heirs forever except she should die without an heir *Page 479 born of her own body; then my will and desire is that all the lastabove real and personal estate goes to James Martin, him and his heirsforever." *Page 480 
The plff. began his show by a possession in Hannah Heavilo as far back as the year 1788. She continued in possession until her death, in 1796, and devised the premises in dispute to her three sons, John, *Page 481 
Roderick, and Edward Heavilo, in fee, to be divided, two shares to John and one share each to the others. She nominated John and Roderick her executors. John and Edward entered into possession *Page 482 
after the death of their mother: Roderick went off and has not been heard of for many years. Mrs. Heavilo's will was duly proved on the fourth January, 1796, and to prove the grant of letters testamentary *Page 483 
the plff. gave in evidence a testamentary bond of the same date, filled up in the names of John and Roderick Heavilo as principals, and James Elliott as surety, and conditioned, in the usual form, for the faithful administration of Hannah Heavilo's estate by John and Roderick Heavilo, her executors. This bond was executed by John Heavilo and James Elliott only. John Heavilo's by his last will and testament, duly proved and allowed, constituted Benjamin Johnson his executor, who took out letters and gave bond and surety in due form.
The plff. then offered in evidence the petition of Benjamin Johnson, executor of John Heavilo, who was the executor of Hannah Heavilo to the orphans' court of Sussex county for an order to sell the land of the said Hannah Heavilo for the payment of her debts, the order thereupon, and the return of the sale made to Mary Fergus. Objected to.
Bayard. Hannah Heavilo left as her executors John and Roderick Heavilo. Roderick never renounced, and he was entitled at any time to take out letters. The execution of the will survived to him on the death of John Heavilo. Benjamin Johnson as his executor had no right to interfere with the administration of Hannah Heavilo's estate, and the proceedings in the orphans' court on his petition were altogether irregular and void. 2 vol. D. L. 891. The entire authority survives to the surviving executor, (Toller, 67, 40-41,) and even if one renounces he may take out letters after the death of the other. Unless it can be shown that Roderick died before John Heavilo, the execution of the will devolved on him at John's death. And the grant of letters, if proved at all in this case, is a joint authority to John and Roderick, for the testamentary bond is conditioned for the faithful administration of this estate by them both, and styles them both executors.
Frame, for plff. No doubt at common law, where there are joint executors and one dies, the execution survives to the other; but our *Page 484 
act of assembly regulates this matter for us by providing (2 Del. L. 891) that all letters testamentary shall be void without bond and surety. Roderick Heavilo never gave bond; the grant of letters to him was therefore void, and the whole authority went to John, who complied with the law by giving bond and surety. And I deny that Roderick had the right, afterward, and whilst the estate was in the course of administration, to interfere with that administration, even on giving bond; much less could he avoid the acts of the other executor. At all events, unless he does give bond he can have no legal authority as executor, and the executor who did give bond and those who legally represent him can proceed in the settlement of the estate. John Heavilo first, and, after his death, Benjamin Johnson, his executor, were the only legal representatives of Mrs. Heavilo's estate, and as such were authorized to apply to the orphans' court for an order to sell her lands for the payment of debts. Again. I submit that at this time it is not competent for the court in this way to inquire into and reverse the proceedings of the orphans' court. That court had jurisdiction of the subject; it was competent for it to decide the questions now raised, whether John Heavilo was the sole executor of his mother; whether Roderick was excluded, either from not having given bond, or from his subsequent death, which may have appeared to that court; and whether Benjamin Johnson, as the executor of John Heavilo, was not the proper representative of Hannah Heavilo. And its decision of these questions ought not to be controverted in this collateral way.
Clayton, for deft. The act of assembly (1 Del. L. 281) only authorizes the orphans' court to order a sale on the application of theexecutor. In terms the act does not give the same power to the executor of an executor. The counsel then is driven to the common law for the principle that an executor of an executor represents the first testator, and the moment he gets there for this principle he is governed by the other, to wit, that on a joint administration the execution of the will goes to the survivor and not to the executor of a deceased executor. We come then to the question, was John Heavilo the legally constituted executor of Hannah Heavilo? I deny it, and I say that the letters granted to him were absolutely void. The bond is drawn up in the name of John and Roderick Heavilo, and the condition is to secure the faithful administration of the estate by both, jointly. It was signed by John only, and by the surety. The grant of letters upon it either conferred a joint power or none. It could not confer a several power to John, for such was not the condition of the bond. The truth is, it conferred no power to any one: the bond was void, and the grant of letters void. But there is no evidence that letters were ever granted even to John Heavilo. The letters themselves are not exhibited, nor is any register of the grant produced. All rests on this irregular and void bond. We do not controvert any matter judicially decided by the orphans' court. These orders of sale *Page 485 
are made ex parte, on the application of the executor or the person presenting himself as the executor. That court never decided the questions now raised.
Frame. The bond we offer is a record. It comes from the register's office. No registry of the grant of letters can be found so far back as 1796; indeed there is no law now requiring such registry, and the practice to this day is different in the different counties on this subject. As to the letters themselves, they are never retained in the office, but given out to the executor. The testamentary bond therefore is in this case the best and the only evidence which can be had of the grant of letters. It states the fact that letters had been granted to John and Roderick Heavilo, and it appears from the face of the bond that Roderick did not execute it. The grant to him was therefore void: was it void also as to the other? The object of taking these bonds is to secure the public; they should be construed so as to attain this end and not to defeat it. Is not the meaning of the act of assembly that the grant of letters shall be void as to those who do not give bond, but good for those who do? Could John Heavilo ever set up the defence to an action on this bond, that he was jointly an executor with another, and therefore not liable?
By the Court.
The question now submitted to the court is of more consequence in its general bearing than in its operation on the present case. Regarding either the policy of the law or the known rules of evidence applicable to the question, we are perfectly clear that, on principle, the objection to the evidence now offered ought not to be sustained.
In developing his title the plff. has set out with the proof of a possession many years ago in Hannah Heavilo. To show the transfer of title from her to Mary Fergus, under whom he claims, he offers in evidence an order of the orphans' court, made on the application of Benjamin Johnson, the executor of John Heavilo, who was executor of Hannah Heavilo, for the sale of these lands for the payment of debts, and the proceedings upon that order under which Mary Fergus became the purchaser. It is objected to this evidence that Benjamin Johnson was not the representative of the estate of Hannah Heavilo, and had no authority to sell these lands; in short, that the order of the orphans' court directing the sale was irregular and void, because made on the petition of a person who was not legally constituted the executor of Mrs. Heavilo. By her will she constituted her two sons, John and Roderick, to be her executors; whether letters were in fact granted to one or both of them is not clearly shown, the only evidence of the grant of letters being a testamentary bond, filled up in the name of both, and conditioned for the faithful administration of the estate by both, but signed only by John Heavilo and by his surety. Roderick Heavilo, it is proved, left the state shortly after the death of his mother, and has never returned. John Heavilo died, having appointed Benjamin Johnson his executor, who took out letters, and as the executor of John Heavilo, who was executor of Hannah Heavilo, obtained the order which is now objected to.
It is conceded that the entering into bond and giving surety is necessary to the appointment of an executor, and that the grant of letters without such bond is void. Roderick Heavilo was therefore never actually the executor of his mother. Whether the bond given *Page 486 
by John Heavilo in the name of both will sustain the grant of letters to him alone, and whether the administration passed to his executor or survived to Roderick, or was void as to both, are questions not necessarily now to be decided, as we rest our opinion on other considerations. Thought it may be remarked that after this lapse of time much would be presumed by a court and jury to supply defects in proceedings, and sustain titles acquired under the orders and decrees of a court of competent jurisdiction.
The orphans' court is a court of peculiar and exclusive jurisdiction over the subject matter of this order; and, of course, over the incidents to the proper exercise of this jurisdiction. The act of assembly (1 vol. 281) authorizes it to call executors to an account of their administration, and if the personal estate shall be found insufficient for the payment of debts, and the heirs or devisees of the decedent shall refuse or neglect to pay them, to make an order for the sale of the decedent's lands, all which sales "shall be deemed as available as if the decedents had sold and conveyed the same lands in their life time." With such authority to proceed in the premises and to decree a sale of the lands, would any irregularity in the proceedings vitiate the title under the court, and could such irregularity be inquired into in a collateral way? The proceedings in the orphans' court was said to be ex-parte; it is nevertheless a proceeding in rem, which by the act of assembly passes all the title of the decedent in the land, and concludes every body. RoscoeEv. 103; Levinz, 236. 1 Stark. Ev. 229; "It is evidently essential to the existence of a jurisdiction of this nature that its adjudications upon the subject matter should be final, not only in the courts in which they are pronounced but in all other courts where the same question arises. It would not only be inconsistent that the decision in rem should not be final in the court in which it is pronounced, but, from the nature of the subject matter, mischievous and inconvenient. Although the parties who are in a greater or less degree affected by the consequences of the judgment may change, the subject matter is immutable, and therefore the decision upon it ought not to be liable to be disturbed. And it ought to be binding in other courts, in order to prevent inconsistency, and to support the jurisdiction of the court in which that sentence has been pronounced, for it would be in vain for a court of exclusive jurisdiction to decide, if its decisions upon the subject matter were to be wholly disregarded." It is doubtful whether any but the heir at law or a creditor could object to the decree, even in the orphans' court or by way of appeal, and it must be regarded as conclusive upon them until vacated or reversed in a regular manner. As a judgment of the court, the propriety of the order of sale of Mrs. Heavilo's land for the payment of her debts is as uncontrovertible in any collateral proceeding as a judgment at law binding on the land and rendering it liable to sale. Suppose the case of a judgment recovered at law against an executor and a sale on such judgment. Could a title derived under such a judgment be invalidated by showing an informality in the executor's bond? And if the objection here made be considered available, you had as well require proof that the executor filed before the orphans' court the accounts of his administration required by the act of assembly, or that the heirs at law or devisees refused or neglected to pay the deficiency, which are pre-requisites to the order for a *Page 487 
sale. There is no stopping place if you once get behind the order
of the orphans' court and open the door for objection to its proceedings. The principle is immensely important in its general bearings. Many of the titles to land in this state are derived immediately or remotely under a sale by order of the orphans' court, and if these titles are liable to be overturned by any defect in the mode of proceeding, however slight, which may be discovered after a lapse of even thirty-five years, the consequences to the community would be alarming. A defect in the executor's bond, it is here insisted, shall have this operation. A stronger example could not be presented of the danger of looking beyond the decree of the court. What purchaser under a sale in the orphans' court ever examines into the validity of the executor's appointment? And can he reasonably be expected to do so? It is conceded that the existence of a legally constituted executor is necessary to the order of sale, but no more essential than the filing an account of his administration of the personal assets; the establishing of a deficiency; the refusal or neglect of the devisees or heirs at law to pay the debt; or, (under the present law) the giving a new bond by the executor. All these are matters for the orphans' court to examine into and decide upon; and any matter necessarily decided by that court in making its decree cannot ever afterwards be questioned in any collateral proceeding. The representative relation of Benjamin Johnson to the estate of Hannah Heavilo was a matter necessary to be decided by the orphans' court in this proceeding; for the order of sale could have been made only on the application of the representative of the estate.
On this general ground we are of opinion that the record and proceedings of the orphans' court may be given in evidence; but perhaps this case might also be decided on another fact appearing from the record. It is clear that at the time of making the order of sale no one could have objected to it on the ground now taken, but the two other devisees Roderick and Edward Heavilo; and the record shows that they were notified and consented to the order.
 Evidence admitted. Exception prayed and granted.
The record showed a sale under the order of the Orphans' court of the premises now in possession of the deft. Roach to James Martin as the agent of Mary Fergus on the 14th June, 1800. Sale approved and confirmed.
Plff. then offered in evidence the record of the deed of Benjamin Johnson, executor of John Heavilo, who was executor of Hannah Heavilo to Mary Fergus, date 22d November, 1800 — proved 21st April, 1802, and recorded, but there was no date of the time of recording. Objected to.
Bayard. No paper entered on the records of the recorder's office thereby becomes evidence unless such entry be made by the authority of law. The law requires deeds to be recorded within a year after their execution, 1 vol. D. L. 220, and this deed not having been recorded within that time is not evidence without the formal proof of its execution. The deed is not invalidated by not being recorded in due time, but the record of it after the year is not authorized and is therefore not evidence. The deed itself must be produced and proved as at common law. *Page 488 
 Frame. The language of the old act is that deeds may be recorded within one year after the execution, and not after they bear date. This deed, though dated in Nov. 1800, was not proved or entitled to record until 1802. The time therefore of its execution, within the meaning of the law and for the purpose of recording is not so apparent from the face of the deed; and much would be presumed after such a length of time. But the point has always been considered as settled by the practice in the late courts which always permitted these old records to be read in evidence though not made within a year from the date of the deeds. We offer this deed also as an antient paper whose execution would be presumed after such a lapse of time.
The Chief Justice said he had made the objection many years ago before the late supreme court in this county and that court would not permit him to argue it. They considered it then to be well settled. It was afterwards decided in Kent in the case of Stout vs.Pollen (or Nickerson vs. Stout) about twenty years ago.
Black, Justice said he had often heard it spoken of in Newcastle county but had not known the point made. The bar considered the question doubtful on the act, but settled by the practice and by decisions which were understood to have been made in the other counties. These decisions had probably induced the strong exclusive expressions in the revised act to which it has been found necessary to add so many supplements extending the time. Objection overruled.
By agreement the further examination of testimony was suspended on the following arrangement. In the case of Martin's Lessee vs.Isaac White, verdict to be rendered for deft. In the case ofMartin's Lessee vs. James Roach, verdict to be rendered for the plff. subject to the opinion of the court on the devise in Mary Fergus' will; and subject also to any benefit of exception to the opinion of the court on the preceding questions of evidence.
Frame, for plff. — The question arises on the fourth clause of the will of Mary Fergus. What is the estate which Eliza Fergus took? We say that it is an estate tail, and the devise over is a vested remainder in fee in James Martin. On the part of the deft. it will probably be contended that it is an estate in fee in Eliza Fergus with an executory devise over to James Martin. There is no doubt that the first clause is a direct devise of a fee to Eliza Fergus; yet it is well settled that, even in such a devise, if there be any words added which qualify the word "heirs" and show an intention of limiting it to the heirs of the body of the devisee, it will only create an estate tail. — 6 Cruise 202; Devise ch. 12 sec. 7. The question then is,' what superadded words will have this effect? and we lay it down with confidence that the expression in this will "except she should die without an heir born of her own body" is of all others the most apt for this purpose.
The whole clause is; "Fourthly. I give and bequeath unto my beloved daughter Eliza Fergus the remainder part of all my real and personal estate to her and her heirs forever, except she should die without an heir born of her own body, then my will and desire is that all the last above real and personal estate goes to James Martin him and his heirs forever." *Page 489 
The words "if he die without issue" if there be nothing to restrict them to issue living at the death, will always reduce a fee simple to an estate tail (sec. 9): yet they are not so strong as this.Heir is a more technical term than issue. Suppose it were "except she should die without issue born of her own body" could there be a doubt that it would be but an estate tail? yet the expression here is even stronger. If this is to be construed an executory devise it cannot be after a general failure of issue or heirs of the body, but must be restricted to heirs of the body of Eliza Fergus living at the time of her death. Is there any thing in this will so to restrict it? can it arise from the use of the word "heir" in the singular number? Not so. Here was the devisee ah illegitimate daughter of the testatrix. She could have no collateral heirs, and the testatrix saw the propriety of confining it to the issue of the body, or lineal descendants. It cannot be confined to the immediate issue of the devisee's body, or children; because technically speaking, Eliza Fergus could have no "heir" during her life, as nemo est hoeres viventis, but chiefly because it would violate the principal intent of the testator and give the property over to James Martin, a stranger, to the exclusion of grand children. For if Eliza Fergus had had issue or children which had died leaving children these could not take on the death of their grandmother and the whole line of lineal heirs would be cut off. Nothing shall be construed an executory devise which can take effect as a remainder, and a vested remainder is preferred to a contingent. 6 Cruise 319. If there be a devise of both real and personal property the terms may be rendered each to each. The same words may give a fee simple or the entire property in the personal estate, and but an estate tail in the realty. 1 P. Wms. 667; Fearne 476.
Bayard. The intention of the testatrix in this case cannot be effectuated without giving to her daughter Eliza Fergus a fee simple, dependent, not on her dying without leaving issue at the time of her death, but on the contingency of her having had no heir, or child, born of her own body. The will is evidently drawn by a person unskilled in the use of legal terms — it was in fact drawn by James Martin, the devisee over — want of technical knowledge is evident on the face of it. Our business is from such a will; regarding the condition of the testatrix and her family; and her main purposes as appearing from the will itself; to elicit and carry out her designs; without so much regarding the precise legal meaning of the words used. Plain common sense would interpret this will thus: — "I give to Eliza Fergus my daughter and to her heirs forever all the remainder part of my property." This is the general intent; to benefit in the fullest extent this first and greatest object of her bounty, her child. And thus far it is a plain fee; but there is a limitation, the common sense meaning of which is equally plain; "except she should die without having had an heir (i.e. a child) born of her body" in that case, and in that case only shall the property go over to a stranger. The word heir may be construed as a word either of limitation or of purchase to meet the intent of the testatrix. 2 Atkyns 582; 3 Chitty Dig. 1365. I agree that "heir" is nomen collectivum and is the same as heirs, but the use of it here shows that it was intended to mean *Page 490 
the same as child; and that it is to he taken as a word of purchase 1 Croke Rep. 66; Archer's case. The use of the word heir in the singular is the reason why in that case it was construed a word of purchase, and not because there is a limitation over to the heirs of that heir. Fearne 102 (150.) I agree that technically there cannot be an heir to a living person but the ordinary acceptation and use of the word is the same with child, or heir apparent. Croke Eliz. 453, another proof of Archer's case in which it is said that this is the vulgar meaning of heir. "Except she should die without an heir born of her own body;" a very strong expression; the word own is added to show that the design was to confine it to her immediate issue, and not to the issue of such issue. What common person would say that an heir born of her own
body could mean an heir born of her child's body." "In case he should depart this life and bear no issue" construed to confine it to issue living at the death of the devisee. Roe vs.Jeffry, 7 T. Rep. 585. "Except she should die without an heir born of her own body is much stronger to show that she meant to confine it to the issue or children born of the body of Eliza Fergus — to a failure of issue at her death.
When words applied to real estate would give an estate tail they give an absolute estate in personal property, 1 Mad. 264; Tollel
vs. Chatham. The limitation of an estate tail in personal property is void. 3 Vezey Jr. 99: Chandler vs. Price.
Is it not certain that Mary Fergus meant to give her personal estate over to Martin on the same event that she gave the real estate. The plff.'s construction undoubtedly defeats this intention as to the personalty, and gives to Eliza Fergus the whole of it without the possibility of its going over to Martin. On our construction that it is a contingent fee dependent on the birth of a child, all the devises both of personal and real may take effect; and the rules of construction require that no part of the instrument shall be defeated if all can take effect. Forth vs. Chapman, 1 P. Wms.
663 is not law.
Clayton. "Heirs" is a word of peculiar meaning. Heirs of the body of A. are his issue and their issue forever. Powell on devises 361-2. But there is a manifest distinction between heirs of the body of A. and "an heir born of her own body" the former is an estate tail because it plainly embraces all the lineal descendants of the first taker; the latter expression shows an equally plain intention to confide it to the immediate descendants or children of the first taker. It has been said that cases on a will are of very little importance as precedents unless in the same words, for they depend on the intent.No case has been found in which such an expression as this has been construed as restricting a previous plain devise in fee to an estate tail, or giving to the heir born of a person's own body the extended signification of issue or of lineal descendants generally. This case then is not to be governed by authority. It must depend on the meaning which the testatrix herself attached to the words. What was her meaning and intention? Did she use the word heir in its legal signification, extending to the thousandth generation, or did she mean such an heir as should spring immediately from her daughter's body; a child born, in the strong language of the will, of her own body. It is impossible to construe this into an indefinite failure of issue *Page 491 
without rejecting the word "own" which is too important as manifesting intent to he rejected. If the words used here force us to the conclusion that the event upon which Mrs. Fergus intended this limitation over to Martin should take effect must happen within the compass of a life or lives in being and twenty one years after, the limitation over is an executory devise and the devise to Eliza Fergus is a contingent fee. And the event necessarily happened within that time. Eliza Fergus was in being, and the heir to be born of her own body had necessarily to be born during her life; if it was not so born the limitation over would take effect; and on the birth of such an heir it was defeated, and the contingent fee became absolute. Cites 1Chitty, Dig. 345; 9 Vezey 197; 7 T. Rep. 589;Roe vs. Jeffry, Fearne 445; 431; (316) Gore vs.Gore.
 Frame, in reply. — The counsel on the other side have taken somewhat different views of this will but they both seem to have settled down on this, that the expression "heir of her own body" means child or children and not issue generally. The great question is, at what time and upon what event was the limitation over to James Martin designed to take effect. Shall it take effect in default of issue living at the death of Eliza Fergus or after a general failure of issue. The law has fixed a meaning to such forms of expression as "dying without issue", "without heir of the body," "heirs of the body,"c. c. and the legal import of all such expressions is a general or indefinite failure of issue. It devolves then on the other side, if this is to be construed an executory devise which it cannot be after a general failure of issue, to show us something indicating the intention of the testatrix to have these terms understood differently from their usual and legal meaning. Doubtless this may and must yield to clear intention, but such intention must be plain and not doubtful. How do they attempt to show this intention? By resorting to the expressionitself and rely upon' words which have a legal definite meaning to prove a different meaning. Much stress has been laid on the wordown. It is not denied that "dying without heirs of her body" would make an estate tail; but "dying without heirs of her own body" is supposed to be a very different thing, as if her body could be other than her own body!! And Powell was cited as supporting some such distinction; which is denied. (Powell on Devises 361-2.) The words first — next — eldest child, c. do not vary the construction, because they express no more than heir; neither can, it be varied by heir born of her own body for this is nothing more than heir born of her body. 4 T. Rep. 605; 8 Term Rep. 211; 26Johns. Rep. 396; n. a. Chr. Kent's opinion.
The general intention of the testator in the use of these words is in accordance with the legal meaning attached to them, though the vulgar meaning may be different; for when a man leaves his property to his child and the lawful issue of that child's body, his intention is that not only children shall take but grandchildren, and the whole line of lineal descendants; though in common acceptation "issue of his child's body" would mean only children.
To what result will Mr. Clayton's construction lead? If "heir born of her own body" means a child or children living at the death of Eliza Fergus, then in case she had had a child and that child had *Page 492 
died in the life time of her mother leaving numerous children, the estate would go over to James Martin to the exclusion of all these grandchildren, for the event would have happened of Eliza Fergus dying "without leaving a child born of her own body." Such a construction is too monstrous to be entertained for a moment on the ground of theintention of Mrs. Fergus.
Mr. Bayard's construction is still less plausible. He will have it that the event upon which the estate was to go over to Martin was the dying of Eliza Fergus without "having had a child born of her own body." How much of a will does he have to make for Mrs. Fergus to get at this!! But establish this construction and it makes it a contingent and conditional fee, and Eliza Fergus having once had a child, the estate could not go to Martin even though at the time of her death there was an entire extinction of her race. Now can it be doubted that the testatrix meant James Martin should have the property if Eliza Fergus died without leaving either children, grandchildren or any issue or descendants? One other thing is absolutely certain from the will; the question whether Martin should in fact ever become entitled to this land was to be determined at the period and on the event of Eliza Fergus's death. But Mr. Bayard's construction makes it dependent on a previous event; the birth of a child. It cannot therefore be correct.
On the question whether the bequest of the personal property in the same words affects the construction as to the reality. I care not whether the same words have the same meaning when applied to different kinds of property, or not. Suppose the law does prevent an entailment of the personalty, it does not necessarily prevent an entailment of realty; on the contrary the law adjudges such an estate from the very words which fail as to the personal property. A devise of "all my property both real and personal to my son A" gives him the absolute estate in the personalty, and only a life estate in the realty. And seeForth vs. Chapman, 1 P. Wms. 663 Porter vs.Bradley, et al. 3 Term R. 143; 7 T. Rep. 589;Roe vs. Jeffry, c. 6 Term. Rep. 307; Daintry
vs. Daintry, 17 Vesey 479; 16 Johns 413.
The court directed the following entry of judgment.
And now, to wit, this twentieth day of April, A.D. 1835, this cause having been argued by counsel on both sides, learned in the law, upon the case stated and agreed upon on both sides and filed in the cause, and the court having heard the same upon the said case stated, it is therefore considered and adjudged by the court, and the court are of the opinion, that the said Eliza Fergus took an estate in tail in the said lands and premises in the said case stated mentioned, by and under the said devise contained in the said last will and testament of the said Mary Fergus in the said case stated also mentioned; and that the limitation or devise of the said lands and premises made in and by said will to the said James Martin was a vested remainder in fee simple;a
and it is further considered and adjudged *Page 493 
by the court that the plff. do recover against the deft. seven equal undivided eighth parts of the said lands and premises in the said case stated mentioned; and that judgment be rendered, and the *Page 494 
court do hereby render judgment for the plff. against the deft. for the said seven equal undivided eighth parts of the said lands and premises, together with the costs of suit.
a Where there is a devise to one and his heirs forever if there be a limitation over and any expression from which it can be collected that the testator intended to restrain the first devise to any particular class of heirs it will be so restricted. As where the limitation over is on a failure of issue; dying without issue of the body, or heirs of the body, c. the previous general devise is restrained to this description of heirs and reduced to an estate tail with a remainder over.
The terms "failing issue" — "dying without issue" and other expressions of similar import have a fixed legal signification, and mean a general or indefinite failure of issue, unless there be something to show that the testator meant to restrict it to a failure of issue at the time of the death of the first taker. For it is reasonably supposed, when nothing appears to the contrary, that the whole line of lineal descendants of the first taker are the objects of the testators' bounty as much as the children or immediate issue; and that a construction which would cut off grandchildren and give the estate to the devisee over on the death of the first taker without children
cannot in the general be in accordance with a testators intention. And, though there has been a constant struggle in the cases to apply the first devise to children, and limit the event on which the devise over shall take effect to a dying without issue living at thetime, the whole current of authorities has established, that whether the form of expression be "dying without issue" — "without issue of his body" — "lawfully begotten of his body" — "leaving no issue of their respective bodies" — "dying without an heir of his body" — c. c. the meaning is still the same, an indefinite failure of issue.
The first case in which this form of expression was construed to mean a definite and not a general failure of issue was the case of Pells
vs. Brown, Cro. Jac. 590. But that case was decided on the particular form of the devise and was not designed to controvert the general rule. It has moreover been much questioned. See Anderson
vs. Jackson, 16 Johns. Rep. 407. Yet it was followed inPorter vs. Bradley, 3 Term. Rep. 143, and Roe
vs. Jeffery both of which cases chancellor Kent designates as "blind guides." In the first, Lord Kenyon thought the words "if he should die leaving no issue behind him" sufficient to restrict it to issue living at his death; and though he placed much stress on the words "behind him" he intimated that the expression leaving noissue would be sufficient. Yet in Daintry vs. Daintry,
(5 Term. Rep. 307, it was decided that "if he should happen to die without leaving issue of his body" meant a general failure of issue.
It is observable that in all the cases giving a restricted construction to "issue" they profess not to violate the general rule, but to establish exceptions on the particular words of the will; yet most of them have been regarded as infringing on the established construction, and have always been more or less controverted. In the principal case the defendant's counsel admitted the general rule; they agreed that if the expression had been "except she should die without issue
born of her body" it would have been an estate tail; but they distinguished between "heir" and issue, and laid much stress on the word "own" as indicating an intention to restrict the meaning. The reason which induced the enlarged meaning applied in legal construction to the word issue, equally applies to this form of expression, namely, that the testatrix did not intend the estate to go over while there were lineal descendants of her daughter to take it. It applied to this will with peculiar force. The first devise was to the testatrix's only child; the remainderman was a stranger in blood. Without strong evidence of that intention it would not be supposed that she intended he should take to the exclusion of the grandchildren or other lineal descendants of her daughter. There is nothing in the word "heir" either in the singular, or "heirs" in the plural, that should give it a more restricted signification than issue. Heirs is a technical word of greater latitude than issue, comprehending all the blood relatives either lineal or collateral. Heirs of the body or "heirs born of the body" is precisely the same as issue, being restricted to lineal heirs and extending to all the lineal descendants. And "heir" isnomen collectivum, and the same with "heirs." 3 Bin. Rep.
374. In one of the earliest cases on the stat. de donis a grant to B. and his heirs forever, provided B. had issue of his body begotten; andif he died without heir of his body the land was to revert, was construed an estate tail. In Denn vs. Slater, 5 Term.Rep. 335, on a devise to B. and if he died without male heir
then to C. and his heirs; Lord Kenyon said it was clearly an estate tail in B. A devise to a son, and, in case he died without heir ofhis body lawfully begotten, then over, is an estate tail.Royal vs. Eppes, 2 Munfa. 479. Has the word "own" in this connection, the force attributed to it by the defendant's counsel? It is difficult to distinguish between the heirs of a man's body, and the heirs of his own body; and such a distinction would seem to be too refined to overturn an established rule of construction. It has been sought to apply a like stress on the words "first," "next," "eldest heir," c. but they have been held not to vary the construction.Powell 361. Lessee of James vs. Avis. 4 TermRep. 605: under a devise" to A. and B. and their heirs " and in case they agree to sell the estate that they should have their equal share of the money arising therefrom, but if they agreed to keep the estate whole together then that the rents should be equally paid and divided between them and the several and respective heirs of them ontheir bodies lawfully begotten." A. and B. took only estates tail. Lessee of Gregory vs. Whichelo, 8 Term Rep. 211. A devise to "A and B. and their heirs forever, provided that if both have issue, then both their dividends to go to the issue of their ownbodies " was held an estate tail. Here the word own actually occurs, and is applied to the issue generally, the nati natorum, etqui nascentur ab illis.